# KIMEL ET AL. *v.* FLORIDA BOARD OF REGENTS ET AL.

No. 98–791.   Argued October 13, 1999—Decided January 11, 2000*

---

*Together with No. 98–796, *United States* v. *Florida Board of Regents et al.,* also on certiorari to the same court.

64

O'CONNOR, J., delivered the opinion of the Court, Parts I, II, and IV of which were joined by REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., and Part III of which was joined by REHNQUIST, C. J., and STEVENS, SCALIA, SOUTER, GINSBURG, and BREYER, JJ. STEVENS, J., filed an opinion dissenting in part and concurring in part, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post,* p. 92. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which KENNEDY, J., joined, *post,* p. 99.

*Jeremiah A. Collins* argued the cause for petitioners in No. 98–791, and respondents under this Court's Rule 12.6 in support of petitioner in No. 98–796. With him on the brief were *Robert H. Chanin, Laurence Gold, David Arendall, Thomas W. Brooks,* and *Gerald J. Houlihan.*

*Barbara D. Underwood* argued the cause for the United States, as petitioner in No. 98–796, and respondent under this Court's Rule 12.6 in support of petitioners in No. 98–791. With her on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Patricia A. Millett, Jessica Dunsay Silver,* and *Seth M. Galanter.*

*Jeffrey S. Sutton* argued the cause for state respondents in both cases. With him on the brief were *Gregory G. Katsas, Robert A. Butterworth,* Attorney General of Florida, *Louis F. Hubener* and *Amelia Beisner,* Assistant Attorneys General, *Bill Pryor,* Attorney General of Alabama, and *Alice Ann Byrne* and *Jack Park,* Assistant Attorneys General.†

---

†*Laurie A. McCann* and *Melvin Radowitz* filed a brief for the American Association of Retired Persons et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Edward B.*

JUSTICE O'CONNOR delivered the opinion of the Court.

The Age Discrimination in Employment Act of 1967 (ADEA or Act), 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.* (1994 ed. and Supp. III), makes it unlawful for an employer, including a State, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U. S. C. § 623(a)(1). In these cases, three sets of plaintiffs filed suit under the Act, seeking money damages for their state employers' alleged discrimination on the basis of age. In each case, the state employer moved to dismiss the suit on the basis of its Eleventh Amendment immunity. The District Court in one case granted the motion to dismiss, while in each of the remaining cases the District Court denied the motion. Appeals in the three cases were consolidated before the Court of Appeals for the Eleventh Circuit, which held that the ADEA does not validly abrogate the States' Eleventh Amendment immunity. In these cases, we are asked to consider whether the ADEA contains a clear

---

*Foley,* State Solicitor, *Stephen P. Carney,* Associate Solicitor, and *Matthew J. Lampke,* Assistant Solicitor, *Paul G. Summers,* Attorney General of Tennessee, and *Michael E. Moore,* Solicitor General, and by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Thurbert E. Baker* of Georgia, *Earl I. Anzai* of Hawaii, *Alan G. Lance* of Idaho, *Carla J. Stoval* of Kansas, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *John J. Farmer, Jr.,* of New Jersey, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *Mark L. Earley* of Virginia; for the Pennsylvania House of Representatives, Republican Caucus, by *David R. Fine* and *John P. Krill, Jr.;* and for the Pacific Legal Foundation by *Robin L. Rivett* and *Frank A. Shepherd.*

Briefs of *amici curiae* were filed for the Coalition for Local Sovereignty by *Kenneth B. Clark;* and for the English Language Advocates by *Barnaby W. Zall.*

statement of Congress' intent to abrogate the States' Eleventh Amendment immunity and, if so, whether the ADEA is a proper exercise of Congress' constitutional authority. We conclude that the ADEA does contain a clear statement of Congress' intent to abrogate the States' immunity, but that the abrogation exceeded Congress' authority under § 5 of the Fourteenth Amendment.

I

A

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U. S. C. § 623(a)(1). The Act also provides several exceptions to this broad prohibition. For example, an employer may rely on age where it "is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." § 623(f)(1). The Act also permits an employer to engage in conduct otherwise prohibited by § 623(a)(1) if the employer's action "is based on reasonable factors other than age," § 623(f)(1), or if the employer "discharge[s] or otherwise discipline[s] an individual for good cause," § 623(f)(3). Although the Act's prohibitions originally applied only to individuals "at least forty years of age but less than sixty-five years of age," 81 Stat. 607, 29 U. S. C. § 631 (1964 ed., Supp. III), Congress subsequently removed the upper age limit, and the Act now covers individuals age 40 and over, 29 U. S. C. § 631(a). Any person aggrieved by an employer's violation of the Act "may bring a civil action in any court of competent jurisdiction" for legal or equitable relief. § 626(c)(1). Section 626(b) also permits aggrieved employees to enforce the Act through certain provisions of the Fair Labor Standards Act of 1938 (FLSA), and the ADEA

specifically incorporates § 16(b) of the FLSA, 29 U. S. C. § 216(b).

Since its enactment, the ADEA's scope of coverage has been expanded by amendment. Of particular importance to these cases is the Act's treatment of state employers and employees. When first passed in 1967, the ADEA applied only to private employers. See 29 U. S. C. § 630(b) (1964 ed., Supp. III) (defining term "employer" to exclude "the United States, a corporation wholly owned by the Government of the United States, or a State or political subdivision thereof"). In 1974, in a statute consisting primarily of amendments to the FLSA, Congress extended application of the ADEA's substantive requirements to the States. Fair Labor Standards Amendments of 1974 (1974 Act), § 28, 88 Stat. 74. Congress accomplished that expansion in scope by a simple amendment to the definition of "employer" contained in 29 U. S. C. § 630(b): "The term [employer] also means . . . a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State . . . ." Congress also amended the ADEA's definition of "employee," still defining the term to mean "an individual employed by any employer," but excluding elected officials and appointed policymakers at the state and local levels. § 630(f). In the same 1974 Act, Congress amended 29 U. S. C. § 216(b), the FLSA enforcement provision incorporated by reference into the ADEA. 88 Stat. 61. Section 216(b) now permits an individual to bring a civil action "against any employer (including a public agency) in any Federal or State court of competent jurisdiction." Section 203(x) defines "[p]ublic agency" to include "the government of a State or political subdivision thereof," and "any agency of . . . a State, or a political subdivision of a State." Finally, in the 1974 Act, Congress added a provision prohibiting age discrimination generally in employment at the Federal Government. 88 Stat. 74, 29 U. S. C. § 633a (1994 ed. and Supp. III). Under the current ADEA,

mandatory age limits for law enforcement officers and fire-fighters—at federal, state, and local levels—are exempted from the statute's coverage. 5 U. S. C. §§ 3307(d), (e); 29 U. S. C. § 623(j) (1994 ed., Supp. III).

## B

In December 1994, Roderick MacPherson and Marvin Narz, ages 57 and 58 at the time, filed suit under the ADEA against their employer, the University of Montevallo, in the United States District Court for the Northern District of Alabama. In their complaint, they alleged that the university had discriminated against them on the basis of their age, that it had retaliated against them for filing discrimination charges with the Equal Employment Opportunity Commission (EEOC), and that its College of Business, at which they were associate professors, employed an evaluation system that had a disparate impact on older faculty members. MacPherson and Narz sought declaratory and injunctive relief, backpay, promotions to full professor, and compensatory and punitive damages. App. 21–25. The University of Montevallo moved to dismiss the suit for lack of subject matter jurisdiction, contending it was barred by the Eleventh Amendment. No party disputes the District Court's holding that the university is an instrumentality of the State of Alabama. On September 9, 1996, the District Court granted the university's motion. *MacPherson* v. *University of Montevallo*, Civ. Action No. 94–AR–2962–S (ND Ala., Sept. 9, 1996), App. to Pet. for Cert. in No. 98–796, pp. 63a–71a. The court determined that, although the ADEA contains a clear statement of Congress' intent to abrogate the States' Eleventh Amendment immunity, Congress did not enact or extend the ADEA under its Fourteenth Amendment § 5 enforcement power. *Id.*, at 67a, 69a–70a. The District Court therefore held that the ADEA did not abrogate the States' Eleventh Amendment immunity. *Id.*, at 71a.

In April 1995, a group of current and former faculty and librarians of Florida State University, including J. Daniel Kimel, Jr., the named petitioner in one of today's cases, filed suit against the Florida Board of Regents in the United States District Court for the Northern District of Florida. Complaint and Demand for Jury Trial in No. 95–CV–40194, 1 Record, Doc. No. 2. The complaint was subsequently amended to add as plaintiffs current and former faculty and librarians of Florida International University. App. 41. The plaintiffs, all over age 40, alleged that the Florida Board of Regents refused to require the two state universities to allocate funds to provide previously agreed upon market adjustments to the salaries of eligible university employees. The plaintiffs contended that the failure to allocate the funds violated both the ADEA and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 *et seq.* (1997 and Supp. 1998), because it had a disparate impact on the base pay of employees with a longer record of service, most of whom were older employees. App. 42–45. The plaintiffs sought backpay, liquidated damages, and permanent salary adjustments as relief. *Id.*, at 46. The Florida Board of Regents moved to dismiss the suit on the grounds of Eleventh Amendment immunity. On May 17, 1996, the District Court denied the motion, holding that Congress expressed its intent to abrogate the States' Eleventh Amendment immunity in the ADEA, and that the ADEA is a proper exercise of congressional authority under the Fourteenth Amendment. No. TCA 95–40194–MMP (ND Fla.), App. to Pet. for Cert. in No. 98–796, pp. 57a–62a.

In May 1996, Wellington Dickson filed suit against his employer, the Florida Department of Corrections, in the United States District Court for the Northern District of Florida. Dickson alleged that the state employer failed to promote him because of his age and because he had filed grievances with respect to the alleged acts of age discrimination. Dickson sought injunctive relief, backpay, and com-

pensatory and punitive damages. App. 83–109. The Florida Department of Corrections moved to dismiss the suit on the grounds that it was barred by the Eleventh Amendment. The District Court denied that motion on November 5, 1996, holding that Congress unequivocally expressed its intent to abrogate the States' Eleventh Amendment immunity in the ADEA, and that Congress had authority to do so under §5 of the Fourteenth Amendment. *Dickson* v. *Florida Dept. of Corrections*, No. 5:96cv207–RH (ND Fla.), App. to Pet. for Cert. in No. 98–796, pp. 72a–76a.

The plaintiffs in the *MacPherson* case, and the state defendants in the *Kimel* and *Dickson* cases, appealed to the Court of Appeals for the Eleventh Circuit. The United States also intervened in all three cases to defend the ADEA's abrogation of the States' Eleventh Amendment immunity. The Court of Appeals consolidated the appeals and, in a divided panel opinion, held that the ADEA does not abrogate the States' Eleventh Amendment immunity. 139 F. 3d 1426, 1433 (1998). Judge Edmondson, although stating that he believed "good reason exists to doubt that the ADEA was (or could have been properly) enacted pursuant to the Fourteenth Amendment," *id.*, at 1430, rested his opinion on the ADEA's lack of unmistakably clear language evidencing Congress' intent to abrogate the States' sovereign immunity. *Ibid.* He noted that the ADEA lacks any reference to the Eleventh Amendment or to the States' sovereign immunity and does not contain, in one place, a plain statement that States can be sued by individuals in federal court. *Id.*, at 1430–1431. Judge Cox concurred in Judge Edmondson's ultimate conclusion that the States are immune from ADEA suits brought by individuals in federal court. *Id.*, at 1444. Judge Cox, however, chose not to address "the thorny issue of Congress's intent," *id.*, at 1445, but instead found that Congress lacks the power under §5 of the Fourteenth Amendment to abrogate the States' Eleventh Amendment immunity under the ADEA. *Ibid.*

He concluded that "the ADEA confers rights far more extensive than those the Fourteenth Amendment provides," *id.*, at 1446, and that "Congress did not enact the ADEA as a proportional response to any widespread violation of the elderly's constitutional rights." *Id.*, at 1447. Chief Judge Hatchett dissented from both grounds. *Id.*, at 1434.

We granted certiorari, 525 U. S. 1121 (1999), to resolve a conflict among the Federal Courts of Appeals on the question whether the ADEA validly abrogates the States' Eleventh Amendment immunity. Compare *Cooper* v. *New York State Office of Mental Health*, 162 F. 3d 770 (CA2 1998) (holding that the ADEA does validly abrogate the States' Eleventh Amendment immunity), cert. pending, No. 98–1524; *Migneault* v. *Peck*, 158 F. 3d 1131 (CA10 1998) (same), cert. pending, No. 98–1178; *Coger* v. *Board of Regents of State of Tenn.*, 154 F. 3d 296 (CA6 1998) (same), cert. pending, No. 98–821; *Keeton* v. *University of Nev. System*, 150 F. 3d 1055 (CA9 1998) (same); *Scott* v. *University of Miss.*, 148 F. 3d 493 (CA5 1998) (same); and *Goshtasby* v. *Board of Trustees of Univ. of Ill.*, 141 F. 3d 761 (CA7 1998) (same), with *Humenansky* v. *Regents of Univ. of Minn.*, 152 F. 3d 822 (CA8 1998) (holding that the ADEA does not validly abrogate the States' Eleventh Amendment immunity), cert. pending, No. 98–1235; and 139 F. 3d 1426 (CA11 1998) (case below).

## II

The Eleventh Amendment states:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Although today's cases concern suits brought by citizens against their own States, this Court has long " 'understood the Eleventh Amendment to stand not so much for what it

says, but for the presupposition . . . which it confirms.'" *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 54 (1996) (quoting *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 779 (1991)). Accordingly, for over a century now, we have made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States. *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U. S. 666, 669–670 (1999); *Seminole Tribe, supra,* at 54; see *Hans* v. *Louisiana,* 134 U. S. 1, 15 (1890). Petitioners nevertheless contend that the States of Alabama and Florida must defend the present suits on the merits because Congress abrogated their Eleventh Amendment immunity in the ADEA. To determine whether petitioners are correct, we must resolve two predicate questions: first, whether Congress unequivocally expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority. *Seminole Tribe, supra,* at 55.

### III

To determine whether a federal statute properly subjects States to suits by individuals, we apply a "simple but stringent test: 'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'" *Dellmuth* v. *Muth,* 491 U. S. 223, 228 (1989) (quoting *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 242 (1985)). We agree with petitioners that the ADEA satisfies that test. The ADEA states that its provisions "shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section." 29 U. S. C. § 626(b). Section 216(b), in turn, clearly provides for suits by individuals against States. That provision authorizes employees to maintain actions for backpay "against any employer (including a public agency)

in any Federal or State court of competent jurisdiction . . . ." Any doubt concerning the identity of the "public agency" defendant named in § 216(b) is dispelled by looking to § 203(x), which defines the term to include "the government of a State or political subdivision thereof," and "any agency of . . . a State, or a political subdivision of a State." Read as a whole, the plain language of these provisions clearly demonstrates Congress' intent to subject the States to suit for money damages at the hands of individual employees.

Respondents maintain that these statutory sections are less than "unmistakably clear" for two reasons. Brief for Respondents 15. First, they note that the ADEA already contains its own enforcement provision, § 626(c)(1), which provides in relevant part that "[a]ny person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter." Respondents claim that the existence of § 626(c)(1) renders Congress' intent to incorporate the clear statement of abrogation in § 216(b), the FLSA's enforcement provision, ambiguous. The text of the ADEA forecloses respondents' argument. Section 626(b) clearly states that the ADEA "shall be enforced in accordance with the powers, remedies, and procedures provided in [section 216(b)] *and* subsection (c) of this section." § 626(b) (emphasis added). In accord with that statutory language, we have explained repeatedly that § 626(b) incorporates the FLSA's enforcement provisions, and that those remedial options operate together with § 626(c)(1). See *McKennon* v. *Nashville Banner Publishing Co.*, 513 U. S. 352, 357 (1995) ("[The ADEA's] remedial provisions incorporate by reference the provisions of the Fair Labor Standards Act of 1938"); *Hoffmann-La Roche Inc.* v. *Sperling*, 493 U. S. 165, 167 (1989) ("[T]he ADEA incorporates enforcement provisions of the Fair Labor Standards Act of 1938, and provides that the ADEA shall be enforced using certain of the powers, remedies, and procedures of the FLSA" (citation omitted)); *Lorillard* v. *Pons*, 434 U. S.

575, 582 (1978) ("[B]ut for those changes Congress expressly made [in the ADEA], it intended to incorporate fully the remedies and procedures of the FLSA"). Respondents' argument attempts to create ambiguity where, according to the statute's text and this Court's repeated interpretations thereof, there is none.

Respondents next point to the phrase "court of competent jurisdiction" in § 216(b), and contend that it makes Congress' intent to abrogate less than clear. Relying on our decision in the distinct context of a state waiver of sovereign immunity, *Kennecott Copper Corp.* v. *State Tax Comm'n,* 327 U. S. 573 (1946), respondents maintain that perhaps Congress simply intended to permit an ADEA suit against a State only in those cases where the State previously has waived its Eleventh Amendment immunity to suit. We disagree. Our decision in *Kennecott Copper* must be read in context. The petitioner there contended that Utah had waived its Eleventh Amendment immunity to suit in federal court through a state statute that authorized taxpayers to pay their taxes under protest and "'thereafter bring an action in any court of competent jurisdiction for the return thereof . . . .'" *Id.,* at 575, n. 1 (quoting Utah Code Ann. § 80–5–76 (1943)). Although the statute undoubtedly provided for suit against the State of Utah in its own courts, we held that the statute fell short of the required "clear declaration by a State of its consent to be sued in the *federal* courts." 327 U. S., at 579–580 (emphasis added). Section 216(b) contains no such ambiguity. The statute authorizes employee suits against States "in any *Federal or State* court of competent jurisdiction." § 216(b) (emphasis added). That language eliminates the ambiguity identified in *Kennecott Copper*—whether Utah intended to permit suits against the sovereign in state court only, or in state and federal court. Under § 216(b), the answer to that question is clear—actions may be maintained in federal and state court. That choice of language sufficiently indicates Congress' in-

tent, in the ADEA, to abrogate the States' Eleventh Amendment immunity to suits by individuals.

Although JUSTICE THOMAS concedes in his opinion that our cases have never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time, *post*, at 104–105 (opinion concurring in part and dissenting in part), he concludes that the ADEA lacks the requisite clarity because of the "sequence of events" surrounding the enactment and amendment of §§ 216(b) and 626(b), *post*, at 102. JUSTICE THOMAS states that he is unwilling to assume that when Congress amended § 216(b) in 1974, it recognized the consequences that amendment would have for the ADEA. *Ibid.* We respectfully disagree. The fact that Congress amended the ADEA itself in the same 1974 Act makes it more than clear that Congress understood the consequences of its actions. Indeed, Congress amended § 216(b) to provide for suits against States in precisely the same Act in which it extended the ADEA's substantive requirements to the States. See 1974 Act, § 6(d)(1), 88 Stat. 61 (amending § 216(b)); § 28(a), 88 Stat. 74 (extending ADEA to the States). Those provisions confirm for us that the effect on the ADEA of the § 216(b) amendment was not mere happenstance. In any event, we have never held that Congress must speak with different gradations of clarity depending on the specific circumstances of the relevant legislation (*e. g.*, amending incorporated provisions as opposed to enacting a statute for the first time). The clear statement inquiry focuses on *what* Congress did enact, not *when* it did so. We will not infer ambiguity from the sequence in which a clear textual statement is added to a statute.

We also disagree with JUSTICE THOMAS' remaining points, see *post*, at 105–109. Although the ADEA does contain its own enforcement provision in § 626(c)(1), the text of § 626(b) acknowledges § 626(c)(1)'s existence and makes clear that the ADEA also incorporates § 216(b), save as indicated

otherwise in § 626(b)'s proviso. See § 626(b) ("The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sectio[n] . . . 216 (except for subsection (a) thereof) . . . *and subsection (c) of this section*" (emphasis added)). We fail to see how the interpretation suggested by JUSTICE THOMAS, under which § 626(b) would carry over only those § 216(b) "embellishments" not already provided for in § 626(c)(1) *except for* the authorization of suits against States, see *post*, at 106, could be a permissible one. To accept that interpretation, for example, one would have to conclude that Congress intended to incorporate only the portion of § 216(b)'s third sentence that provides for collective actions, but not the part of the very same sentence that authorizes suits against States. See § 216(b) ("An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated").

JUSTICE THOMAS also concludes that § 216(b) itself fails the clear statement test. *Post*, at 108–109. As we have already explained, the presence of the word "competent" in § 216(b) does not render that provision less than "unmistakably clear." See *supra*, at 75–76. JUSTICE THOMAS' reliance on a single phrase from our decision in *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.*, 411 U. S. 279 (1973), see *post*, at 108, as support for the contrary proposition is puzzling, given his separate argument with respect to § 6(d)(2)(A) of the 1974 Act. Crucial to JUSTICE THOMAS' argument on that front is his acknowledgment that Congress *did* intend in the 1974 amendments to permit "FLSA plaintiffs who had been frustrated by state defendants' invocation of Eleventh Amendment immunity under *Employees* to avail themselves of the newly amended § 216(b)." *Post*, at 103;

see also *post*, at 108–109. We agree with the implication of that statement: In response to *Employees*, Congress clearly intended through "the newly amended § 216(b)" to abrogate the States' sovereign immunity. In light of our conclusion that Congress unequivocally expressed its intent to abrogate the States' Eleventh Amendment immunity, we now must determine whether Congress effectuated that abrogation pursuant to a valid exercise of constitutional authority.

## IV

### A

This is not the first time we have considered the constitutional validity of the 1974 extension of the ADEA to state and local governments. In *EEOC* v. *Wyoming,* 460 U. S. 226, 243 (1983), we held that the ADEA constitutes a valid exercise of Congress' power "[t]o regulate Commerce . . . among the several States," Art. I, § 8, cl. 3, and that the Act did not transgress any external restraints imposed on the commerce power by the Tenth Amendment. Because we found the ADEA valid under Congress' Commerce Clause power, we concluded that it was unnecessary to determine whether the Act also could be supported by Congress' power under § 5 of the Fourteenth Amendment. 460 U. S., at 243. But see *id.,* at 259–263 (Burger, C. J., dissenting). Resolution of today's cases requires us to decide that question.

In *Seminole Tribe,* we held that Congress lacks power under Article I to abrogate the States' sovereign immunity. 517 U. S., at 72–73. "Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Id.,* at 72. Last Term, in a series of three decisions, we reaffirmed that central holding of *Seminole Tribe.* See *College Savings Bank,* 527 U. S., at 672; *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,*

527 U. S. 627, 636 (1999); *Alden* v. *Maine,* 527 U. S. 706, 712 (1999). Indeed, in *College Savings Bank,* we rested our decision to overrule the constructive waiver rule of *Parden* v. *Terminal R. Co. of Ala. Docks Dept.,* 377 U. S. 184 (1964), in part, on our *Seminole Tribe* holding. See *College Savings Bank, supra,* at 683 ("Recognizing a congressional power to exact constructive waivers of sovereign immunity through the exercise of Article I powers would also, as a practical matter, permit Congress to circumvent the antiabrogation holding of *Seminole Tribe*"). Under our firmly established precedent then, if the ADEA rests solely on Congress' Article I commerce power, the private petitioners in today's cases cannot maintain their suits against their state employers.

JUSTICE STEVENS disputes that well-established precedent again. Compare *post,* p. 92 (opinion dissenting in part and concurring in part), with *Alden, supra,* p. 760 (SOUTER, J., dissenting); *College Savings Bank,* 527 U. S., at 692, n. 2 (STEVENS, J., dissenting); *id.,* at 699–705 (BREYER, J., dissenting); *Florida Prepaid, supra,* at 664–665 (STEVENS, J., dissenting); *Seminole Tribe,* 517 U. S., at 76–100 (STEVENS, J., dissenting); *id.,* at 100–185 (SOUTER, J., dissenting). In *Alden,* we explained that, "[a]lthough the sovereign immunity of the States derives at least in part from the common-law tradition, the structure and history of the Constitution make clear that the immunity exists today by constitutional design." 527 U. S., at 733. For purposes of today's decision, it is sufficient to note that we have on more than one occasion explained the substantial reasons for adhering to that constitutional design. See *id.,* at 712–754; *College Savings Bank, supra,* at 669–670, 687–691; *Seminole Tribe, supra,* at 54–55, 59–73; *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1, 30–42 (1989) (SCALIA, J., concurring in part and dissenting in part). Indeed, the present dissenters' refusal to accept the validity and natural import of decisions like *Hans,* rendered over a full century ago by this Court, makes it dif-

ficult to engage in additional meaningful debate on the place of state sovereign immunity in the Constitution. Compare *Hans*, 134 U. S., at 10, 14–16, with *post*, at 97 (STEVENS, J., dissenting in part and concurring in part). Today we adhere to our holding in *Seminole Tribe:* Congress' powers under Article I of the Constitution do not include the power to subject States to suit at the hands of private individuals.

Section 5 of the Fourteenth Amendment, however, does grant Congress the authority to abrogate the States' sovereign immunity. In *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), we recognized that "the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of §5 of the Fourteenth Amendment." *Id.*, at 456 (citation omitted). Since our decision in *Fitzpatrick*, we have reaffirmed the validity of that congressional power on numerous occasions. See, *e. g.*, *College Savings Bank, supra*, at 670; *Florida Prepaid, supra*, at 636–637; *Alden, supra*, at 756; *Seminole Tribe, supra*, at 59. Accordingly, the private petitioners in these cases may maintain their ADEA suits against the States of Alabama and Florida if, and only if, the ADEA is appropriate legislation under §5.

### B

The Fourteenth Amendment provides, in relevant part:

> "Section 1. . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

> "Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

As we recognized most recently in *City of Boerne* v. *Flores*, 521 U. S. 507, 517 (1997), §5 is an affirmative grant of power to Congress. "It is for Congress in the first instance to

'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." *Id.*, at 536 (quoting *Katzenbach* v. *Morgan*, 384 U. S. 641, 651 (1966)). Congress' § 5 power is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment. Rather, Congress' power "to enforce" the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text. 521 U. S., at 518.

Nevertheless, we have also recognized that the same language that serves as the basis for the affirmative grant of congressional power also serves to limit that power. For example, Congress cannot "decree the *substance* of the Fourteenth Amendment's restrictions on the States. . . . It has been given the power 'to enforce,' not the power to determine *what constitutes* a constitutional violation." *Id.*, at 519 (emphases added). The ultimate interpretation and determination of the Fourteenth Amendment's substantive meaning remains the province of the Judicial Branch. *Id.*, at 536. In *City of Boerne*, we noted that the determination whether purportedly prophylactic legislation constitutes appropriate remedial legislation, or instead effects a substantive redefinition of the Fourteenth Amendment right at issue, is often difficult. *Id.*, at 519–520. The line between the two is a fine one. Accordingly, recognizing that "Congress must have wide latitude in determining where [that line] lies," we held that "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.*, at 520.

In *City of Boerne*, we applied that "congruence and proportionality" test and held that the Religious Freedom Restoration Act of 1993 (RFRA) was not appropriate legislation under § 5. We first noted that the legislative record contained very little evidence of the unconstitutional conduct

purportedly targeted by RFRA's substantive provisions. Rather, Congress had uncovered only "anecdotal evidence" that, standing alone, did not reveal a "widespread pattern of religious discrimination in this country." *Id.*, at 531. Second, we found that RFRA is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.*, at 532.

Last Term, we again had occasion to apply the "congruence and proportionality" test. In *Florida Prepaid,* we considered the validity of the Eleventh Amendment abrogation provision in the Patent and Plant Variety Protection Remedy Clarification Act (Patent Remedy Act). We held that the statute, which subjected States to patent infringement suits, was not appropriate legislation under § 5 of the Fourteenth Amendment. The Patent Remedy Act failed to meet our congruence and proportionality test first because "Congress identified no pattern of patent infringement *by the States*, let alone a pattern of constitutional violations." 527 U. S., at 640 (emphasis added). Moreover, because it was unlikely that many of the acts of patent infringement affected by the statute had any likelihood of being unconstitutional, we concluded that the scope of the Act was out of proportion to its supposed remedial or preventive objectives. *Id.*, at 647. Instead, "[t]he statute's apparent and more basic aims were to provide a uniform remedy for patent infringement and to place States on the same footing as private parties under that regime." *Id.*, at 647–648. While we acknowledged that such aims may be proper congressional concerns under Article I, we found them insufficient to support an abrogation of the States' Eleventh Amendment immunity after *Seminole Tribe. Florida Prepaid, supra,* at 648.

## C

Applying the same "congruence and proportionality" test in these cases, we conclude that the ADEA is not "appro-

priate legislation" under § 5 of the Fourteenth Amendment. Initially, the substantive requirements the ADEA imposes on state and local governments are disproportionate to any unconstitutional conduct that conceivably could be targeted by the Act. We have considered claims of unconstitutional age discrimination under the Equal Protection Clause three times. See *Gregory* v. *Ashcroft*, 501 U. S. 452 (1991); *Vance* v. *Bradley*, 440 U. S. 93 (1979); *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307 (1976) *(per curiam)*. In all three cases, we held that the age classifications at issue did not violate the Equal Protection Clause. See *Gregory*, *supra*, at 473; *Bradley*, *supra*, at 102–103, n. 20, 108–112; *Murgia*, *supra*, at 317. Age classifications, unlike governmental conduct based on race or gender, cannot be characterized as "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 440 (1985). Older persons, again, unlike those who suffer discrimination on the basis of race or gender, have not been subjected to a " 'history of purposeful unequal treatment.' " *Murgia*, *supra*, at 313 (quoting *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 28 (1973)). Old age also does not define a discrete and insular minority because all persons, if they live out their normal life spans, will experience it. 427 U. S., at 313–314. Accordingly, as we recognized in *Murgia*, *Bradley*, and *Gregory*, age is not a suspect classification under the Equal Protection Clause. See, *e. g.*, *Gregory*, *supra*, at 470; *Bradley*, *supra*, at 97; *Murgia*, *supra*, at 313–314.

States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest. The rationality commanded by the Equal Protection Clause does not require States to match age distinctions and the legitimate interests they serve with razorlike precision. As

we have explained, when conducting rational basis review "we will not overturn such [government action] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational." *Bradley, supra,* at 97. In contrast, when a State discriminates on the basis of race or gender, we require a tighter fit between the discriminatory means and the legitimate ends they serve. See, *e. g., Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 227 (1995) ("[Racial] classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests"); *Mississippi Univ. for Women* v. *Hogan,* 458 U. S. 718, 724 (1982) (holding that gender classifications are constitutional only if they serve "'important governmental objectives and . . . the discriminatory means employed' are 'substantially related to the achievement of those objectives'" (citation omitted)). Under the Fourteenth Amendment, a State may rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests. The Constitution does not preclude reliance on such generalizations. That age proves to be an inaccurate proxy in any individual case is irrelevant. "[W]here rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.'" *Murgia, supra,* at 316 (quoting *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970)). Finally, because an age classification is presumptively rational, the individual challenging its constitutionality bears the burden of proving that the "facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Bradley, supra,* at 111; see *Gregory, supra,* at 473.

Our decisions in *Murgia, Bradley,* and *Gregory* illustrate these principles. In all three cases, we held that the States' reliance on broad generalizations with respect to age did

not violate the Equal Protection Clause. In *Murgia,* we up-held against an equal protection challenge a Massachusetts statute requiring state police officers to retire at age 50. The State justified the provision on the ground that the age classification assured the State of the physical preparedness of its officers. 427 U. S., at 314–315. Although we acknowledged that Officer Murgia himself was in excellent physical health and could still perform the duties of a state police officer, we found that the statute clearly met the require-ments of the Equal Protection Clause. *Id.,* at 311, 314–317. "That the State chooses not to determine fitness more pre-cisely through individualized testing after age 50 [does not prove] that the objective of assuring physical fitness is not rationally furthered by a maximum-age limitation." *Id.,* at 316. In *Bradley,* we considered an equal protection chal-lenge to a federal statute requiring Foreign Service officers to retire at age 60. We explained: "If increasing age brings with it increasing susceptibility to physical difficulties, . . . the fact that individual Foreign Service employees may be able to perform past age 60 does not invalidate [the statute] any more than did the similar truth undercut compulsory retirement at age 50 for uniformed state police in *Murgia.*" 440 U. S., at 108. Finally, in *Gregory,* we upheld a provision of the Missouri Constitution that required judges to retire at age 70. Noting that the Missouri provision was based on a generalization about the effect of old age on the ability of individuals to serve as judges, we acknowledged that "[i]t is far from true that all judges suffer significant de-terioration in performance at age 70," "[i]t is probably not true that most do," and "[i]t may not be true at all." 501 U. S., at 473. Nevertheless, because Missouri's age classifi-cation was subject only to rational basis review, we held that the State's reliance on such imperfect generalizations was entirely proper under the Equal Protection Clause. *Ibid.* These decisions thus demonstrate that the constitutionality of state classifications on the basis of age cannot be deter-

mined on a person-by-person basis. Our Constitution permits States to draw lines on the basis of age when they have a rational basis for doing so at a class-based level, even if it "is probably not true" that those reasons are valid in the majority of cases.

Judged against the backdrop of our equal protection jurisprudence, it is clear that the ADEA is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne,* 521 U. S., at 532. The Act, through its broad restriction on the use of age as a discriminating factor, prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard. The ADEA makes unlawful, in the employment context, all "discriminat[ion] against any individual . . . because of such individual's age." 29 U. S. C. § 623(a)(1). Petitioners, relying on the Act's exceptions, dispute the extent to which the ADEA erects protections beyond the Constitution's requirements. They contend that the Act's prohibition, considered together with its exceptions, applies only to arbitrary age discrimination, which in the majority of cases corresponds to conduct that violates the Equal Protection Clause. We disagree.

Petitioners stake their claim on § 623(f)(1). That section permits employers to rely on age when it "is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." Petitioners' reliance on the "bona fide occupational qualification" (BFOQ) defense is misplaced. Our interpretation of § 623(f)(1) in *Western Air Lines, Inc.* v. *Criswell,* 472 U. S. 400 (1985), conclusively demonstrates that the defense is a far cry from the rational basis standard we apply to age discrimination under the Equal Protection Clause. The petitioner in that case maintained that, pursuant to the BFOQ defense, employers must be permitted to rely on age when such reliance

has a "rational basis in fact." *Id.*, at 417. We rejected that argument, explaining that "[t]he BFOQ standard adopted in the statute is one of 'reasonable necessity,' not reasonableness," *id.*, at 419, and that the ADEA standard and the rational basis test are "significantly different," *id.*, at 421.

Under the ADEA, even with its BFOQ defense, the State's use of age is prima facie unlawful. See 29 U. S. C. § 623(a)(1); *Western Air Lines*, 472 U. S., at 422 ("Under the Act, employers are to evaluate employees . . . on their merits and not their age"). Application of the Act therefore starts with a presumption in favor of requiring the employer to make an individualized determination. See *ibid.* In *Western Air Lines*, we concluded that the BFOQ defense, which shifts the focus from the merits of the individual employee to the necessity for the age classification as a whole, is " 'meant to be an extremely narrow exception to the general prohibition' of age discrimination contained in the ADEA." *Id.*, at 412 (citation omitted). We based that conclusion on both the restrictive language of the statutory BFOQ provision itself and the EEOC's regulation interpreting that exception. See 29 CFR § 1625.6(a) (1998) ("It is anticipated that this concept of a [BFOQ] will have limited scope and application. Further, as this is an exception to the Act it must be narrowly construed"). To succeed under the BFOQ defense, we held that an employer must demonstrate either "a substantial basis for believing that *all or nearly all employees* above an age lack the qualifications required for the position," or that reliance on the age classification is necessary because "it is *highly impractical* for the employer to insure by individual testing that its employees will have the necessary qualifications for the job." 472 U. S., at 422–423 (emphases added). Measured against the rational basis standard of our equal protection jurisprudence, the ADEA plainly imposes substantially higher burdens on state employers. Thus, although it is true that the existence of the BFOQ defense makes the ADEA's prohibition of age dis-

crimination less than absolute, the Act's substantive requirements nevertheless remain at a level akin to our heightened scrutiny cases under the Equal Protection Clause.

Petitioners also place some reliance on the next clause in § 623(f)(1), which permits employers to engage in conduct otherwise prohibited by the Act "where the differentiation is based on reasonable factors other than age." This exception confirms, however, rather than disproves, the conclusion that the ADEA's protection extends beyond the requirements of the Equal Protection Clause. The exception simply makes clear that "[t]he employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly." *Hazen Paper Co.* v. *Biggins,* 507 U. S. 604, 611 (1993). Under the Constitution, in contrast, States may rely on age as a proxy for other characteristics. See *Gregory,* 501 U. S., at 473 (generalization about ability to serve as judges at age 70); *Bradley,* 440 U. S., at 108–109, 112 (generalization about ability to serve as Foreign Service officer at age 60); *Murgia,* 427 U. S., at 314–317 (generalization about ability to serve as state police officer at age 50). Section 623(f)(1), then, merely confirms that Congress, through the ADEA, has effectively elevated the standard for analyzing age discrimination to heightened scrutiny.

That the ADEA prohibits very little conduct likely to be held unconstitutional, while significant, does not alone provide the answer to our § 5 inquiry. Difficult and intractable problems often require powerful remedies, and we have never held that § 5 precludes Congress from enacting reasonably prophylactic legislation. Our task is to determine whether the ADEA is in fact just such an appropriate remedy or, instead, merely an attempt to substantively redefine the States' legal obligations with respect to age discrimination. One means by which we have made such a determination in the past is by examining the legislative record containing the reasons for Congress' action. See, *e. g., Flor-*

*ida Prepaid*, 527 U. S., at 640–647; *City of Boerne*, 521 U. S., at 530–531. "The appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *Id.*, at 530 (citing *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308 (1966)).

Our examination of the ADEA's legislative record confirms that Congress' 1974 extension of the Act to the States was an unwarranted response to a perhaps inconsequential problem. Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation. The evidence compiled by petitioners to demonstrate such attention by Congress to age discrimination by the States falls well short of the mark. That evidence consists almost entirely of isolated sentences clipped from floor debates and legislative reports. See, *e. g.*, S. Rep. No. 93–846, p. 112 (1974); S. Rep. No. 93–690, p. 56 (1974); H. R. Rep. No. 93–913, pp. 40–41 (1974); S. Rep. No. 93–300, p. 57 (1973); Senate Special Committee on Aging, Improving the Age Discrimination Law, 93d Cong., 1st Sess., 14 (Comm. Print 1973); 113 Cong. Rec. 34742 (1967) (remarks of Rep. Steiger); *id.*, at 34749 (remarks of Rep. Donohue); 110 Cong. Rec. 13490 (1964) (remarks of Sen. Smathers); *id.*, at 9912 (remarks of Sen. Sparkman); *id.*, at 2596 (remarks of Rep. Beckworth). The statements of Senator Bentsen on the floor of the Senate are indicative of the strength of the evidence relied on by petitioners. See, *e. g.*, 118 Cong. Rec. 24397 (1972) (stating that "there is ample evidence that age discrimination is broadly practiced in government employment," but relying on newspaper articles about federal employees); *id.*, at 7745 ("Letters from my own State have revealed that State and local governments have also been guilty of discrimination toward older employees"); *ibid.* ("[T]here are strong indications that the hiring and firing practices of governmental units discriminate against the elderly . . .").

Petitioners place additional reliance on Congress' consideration of a 1966 report prepared by the State of California on age discrimination in its public agencies. See Hearings on H. R. 3651 et al. before the Subcommittee on Labor of the House of Representatives Committee on Education and Labor, 90th Cong., 1st Sess., pp. 161–201 (1967) (Hearings) (reprinting State of California, Citizens' Advisory Committee on Aging, Age Discrimination in Public Agencies (1966)). Like the assorted sentences petitioners cobble together from a decade's worth of congressional reports and floor debates, the California study does not indicate that the State had engaged in any *unconstitutional* age discrimination. In fact, the report stated that the majority of the age limits uncovered in the state survey applied in the law enforcement and firefighting occupations. Hearings 168. Those age limits were not only permitted under California law at the time, see *ibid.*, but are also currently permitted under the ADEA. See 5 U. S. C. §§ 3307(d), (e); 29 U. S. C. § 623(j) (1994 ed., Supp. III). Even if the California report had uncovered a pattern of unconstitutional age discrimination in the State's public agencies at the time, it nevertheless would have been insufficient to support Congress' 1974 extension of the ADEA to every State of the Union. The report simply does not constitute "evidence that [unconstitutional age discrimination] had become a problem of national import." *Florida Prepaid, supra,* at 641.

Finally, the United States' argument that Congress found substantial age discrimination in the private sector, see Brief for United States 38, is beside the point. Congress made no such findings with respect to the States. Although we also have doubts whether the findings Congress did make with respect to the private sector could be extrapolated to support a finding of *unconstitutional* age discrimination in the public sector, it is sufficient for these cases to note that Congress failed to identify a widespread pattern of age dis-

crimination by the States. See *Florida Prepaid*, 527 U. S., at 640.

A review of the ADEA's legislative record as a whole, then, reveals that Congress had virtually no reason to believe that state and local governments were unconstitutionally discriminating against their employees on the basis of age. Although that lack of support is not determinative of the §5 inquiry, *id.*, at 646; *City of Boerne, supra*, at 531–532, Congress' failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field. In light of the indiscriminate scope of the Act's substantive requirements, and the lack of evidence of widespread and unconstitutional age discrimination by the States, we hold that the ADEA is not a valid exercise of Congress' power under §5 of the Fourteenth Amendment. The ADEA's purported abrogation of the States' sovereign immunity is accordingly invalid.

### D

Our decision today does not signal the end of the line for employees who find themselves subject to age discrimination at the hands of their state employers. We hold only that, in the ADEA, Congress did not validly abrogate the States' sovereign immunity to suits by private individuals. State employees are protected by state age discrimination statutes, and may recover money damages from their state employers, in almost every State of the Union.* Those ave-

---

*See Alaska Stat. Ann. §18.80.010 *et seq.* (1998); Ariz. Rev. Stat. Ann. §41–1401 *et seq.* (1999); Ark. Code Ann. §§21–3–201, 21–3–203 (1996); Cal. Govt. Code Ann. §12900 *et seq.* (West 1992 and Supp. 1999); Colo. Rev. Stat. §24–34–301 *et seq.* (1998); Conn. Gen. Stat. §46a–51 *et seq.* (1999); Del. Code Ann., Tit. 19, §710 *et seq.* (Supp. 1998); Fla. Stat. §§112.044, 760.01 *et seq.* (1997 and 1998 Supp.); Ga. Code Ann. §45–19–21 *et seq.* (1990 and Supp. 1996); Haw. Rev. Stat. §378–1 *et seq.* (1993 and Cum. Supp. 1998); Idaho Code §67–5901 *et seq.* (1995 and Supp. 1999); Ill. Comp. Stat., ch. 775, §5/1–101 *et seq.* (1998); Ind. Code §22–9–2–1 *et seq.* (1993); Iowa

nues of relief remain available today, just as they were before this decision.

Because the ADEA does not validly abrogate the States' sovereign immunity, however, the present suits must be dismissed. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting in part and concurring in part.

Congress' power to regulate the American economy includes the power to regulate both the public and the private

Code § 216.1 *et seq.* (1994 and Supp. 1999); Kan. Stat. Ann. § 44–1111 *et seq.* (1993 and Cum. Supp. 1998); Ky. Rev. Stat. Ann. § 344.010 *et seq.* (Michie 1997 and Supp. 1998); La. Rev. Stat. Ann. § 23:311 *et seq.* (West 1998); *id.*, § 51:2231 *et seq.* (West Supp. 1999); Me. Rev. Stat. Ann., Tit. 5, § 4551 *et seq.* (1998–1999 Supp.); Md. Ann. Code, Art. 49B, § 1 *et seq.* (1998 and Supp. 1999); Mass. Gen. Laws § 151:1 *et seq.* (1997 and 1997 Supp.); Mich. Comp. Laws § 37.2101 *et seq.* (West 1985 and Supp. 1999); Minn. Stat. § 363.01 *et seq.* (1991 and Supp. 1999); Miss. Code Ann. § 25–9–149 (1991); Mo. Rev. Stat. § 213.010 *et seq.* (1994 and Cum. Supp. 1998); Mont. Code Ann. § 49–1–101 *et seq.* (1997); Neb. Rev. Stat. § 48–1001 *et seq.* (1998); Nev. Rev. Stat. § 613.310 *et seq.* (1995); N. H. Rev. Stat. Ann. § 354–A:1 *et seq.* (1995 and Supp. 1998); N. J. Stat. Ann. §§ 10:3–1, 10:5–1 *et seq.* (West 1993 and Supp. 1999); N. M. Stat. Ann. § 28–1–1 *et seq.* (1996); N. Y. Exec. Law § 290 *et seq.* (McKinney 1993 and Supp. 1999); N. C. Gen. Stat. § 126–16 *et seq.* (1999); N. D. Cent. Code § 14–02.4–01 *et seq.* (1997 and Supp. 1999); Ohio Rev. Code Ann. § 4112.01 *et seq.* (1998); Okla. Stat., Tit. 25, § 1101 *et seq.* (1991 and Supp. 1999); Ore. Rev. Stat. § 659.010 *et seq.* (1997); 43 Pa. Cons. Stat. § 951 *et seq.* (1991 and Supp. 1999); R. I. Gen. Laws § 28–5–1 *et seq.* (1995 and Supp. 1997); S. C. Code Ann. § 1–13–10 *et seq.* (1986 and Cum. Supp. 1998); Tenn. Code Ann. § 4–21–101 *et seq.* (1998); Tex. Lab. Code Ann. § 21.001 *et seq.* (1996 and Supp. 1999); Utah Code Ann. § 34A–5–101 *et seq.* (Supp. 1999); Vt. Stat. Ann., Tit. 21, § 495 *et seq.* (1987 and Supp. 1999); Va. Code Ann. § 2.1–116.10 *et seq.* (1995 and Supp. 1999); Wash. Rev. Code § 49.60.010 *et seq.* (1994); W. Va. Code § 5–11–1 *et seq.* (1999); Wis. Stat. Ann. § 111.01 *et seq.* (West 1997 and Supp. 1998); Wyo. Stat. Ann. § 27–9–101 *et seq.* (1999).

sectors of the labor market. Federal rules outlawing discrimination in the workplace, like the regulation of wages and hours or health and safety standards, may be enforced against public as well as private employers. In my opinion, Congress' power to authorize federal remedies against state agencies that violate federal statutory obligations is coextensive with its power to impose those obligations on the States in the first place. Neither the Eleventh Amendment nor the doctrine of sovereign immunity places any limit on that power. See *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 165–168 (1996) (SOUTER, J., dissenting); *EEOC* v. *Wyoming,* 460 U. S. 226, 247–248 (1983) (STEVENS, J., concurring).

The application of the ancient judge-made doctrine of sovereign immunity in cases like these is supposedly justified as a freestanding limit on congressional authority, a limit necessary to protect States' "dignity and respect" from impairment by the National Government. The Framers did not, however, select the Judicial Branch as the constitutional guardian of those state interests. Rather, the Framers designed important structural safeguards to ensure that when the National Government enacted substantive law (and provided for its enforcement), the normal operation of the legislative process itself would adequately defend state interests from undue infringement. See generally Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum. L. Rev. 543 (1954).

It is the Framers' compromise giving each State equal representation in the Senate that provides the principal structural protection for the sovereignty of the several States. The composition of the Senate was originally determined by the legislatures of the States, which would guarantee that their interests could not be ignored by Congress.[1]

---

[1] The Federalist No. 45, p. 291 (C. Rossiter ed. 1961) (J. Madison) ("The State governments may be regarded as constituent and essential parts of the federal government . . . . The Senate will be elected absolutely and

The Framers also directed that the House be composed of Representatives selected by voters in the several States, the consequence of which is that "the states are the strategic yardsticks for the measurement of interest and opinion, the special centers of political activity, the separate geographical determinants of national as well as local politics." *Id.*, at 546.

Whenever Congress passes a statute, it does so against the background of state law already in place; the propriety of taking national action is thus measured by the metric of the existing state norms that Congress seeks to supplement or supplant.[2] The persuasiveness of any justification for overcoming legislative inertia and taking national action, either creating new federal obligations or providing for their enforcement, must necessarily be judged in reference to state interests, as expressed in existing state laws. The precise scope of federal laws, of course, can be shaped with nuanced attention to state interests. The Congress also has the authority to grant or withhold jurisdiction in lower federal courts. The burden of being haled into a federal forum for the enforcement of federal law, thus, can be expanded or contracted as Congress deems proper, which decision, like all other legislative acts, necessarily contemplates state interests. Thus, Congress can use its broad range of flexible legislative tools to approach the delicate issue of how to balance local and national interests in the

exclusively by the State legislatures. . . . Thus, [it] will owe its existence more or less to the favor of the State governments, and must consequently feel a dependence, which is much more likely to beget a disposition too obsequious than too overbearing towards them").

[2] When Congress expanded the Age Discrimination in Employment Act of 1967 (ADEA) in 1974 to apply to public employers, all 50 States had some form of age discrimination law, but 24 of them did not extend their own laws to public employers. See App. to Brief for Respondents 1a–25a.

most responsive and careful manner.[3]  It is quite evident, therefore, that the Framers did not view this Court as the ultimate guardian of the States' interest in protecting their own sovereignty from impairment by "burdensome" federal laws.[4]

---

[3] Thus, the present majority's view does more than simply aggrandize the power of the Judicial Branch. It also limits Congress' options for responding with precise attention to state interests when it takes national action. The majority's view, therefore, does not bolster the Framers' plan of structural safeguards for state interests. Rather, it is fundamentally at odds with that plan. Indeed, as JUSTICE BREYER has explained, forbidding private remedies may necessitate the enlargement of the federal bureaucracy and make it more difficult "to decentralize governmental decisionmaking and to provide individual citizens, or local communities, with a variety of enforcement powers." *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 705 (1999) (dissenting opinion); see also *Printz* v. *United States*, 521 U. S. 898, 976–978 (1997) (BREYER, J., dissenting).

[4] The President also plays a role in the enactment of federal law, and the Framers likewise provided structural safeguards to protect state interests in the selection of the President. The electors who choose the President are appointed in a manner directed by the state legislatures. Art. II, § 1, cl. 2. And if a majority of electors do not cast their vote for one person, then the President is chosen by the House of Representatives. "But in chusing the President" by this manner, the Constitution directs that "the Votes shall be taken *by States*, the Representatives from each State having one Vote." Art. II, § 1, cl. 3 (emphasis added); see also Amdt. 12.

Moreover, the Constitution certainly protects state interests in other ways as well, as in the provisions of Articles IV, V, and VII. My concern here, however, is with the respect for state interests safeguarded by the ordinary legislative process. The balance between national and local interests reflected in other constitutional provisions may vary, see, *e. g., U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779 (1995), but insofar as Congress' legislative authority is concerned, the relevant constitutional provisions were crafted to ensure that the process itself adequately accounted for local interests.

I also recognize that the Judicial Branch sometimes plays a role in limiting the product of the legislative process. It may do so, for example, when the exercise of legislative authority runs up against some other con-

Federalism concerns do make it appropriate for Congress to speak clearly when it regulates state action. But when it does so, as it has in these cases,[5] we can safely presume that the burdens the statute imposes on the sovereignty of the several States were taken into account during the deliberative process leading to the enactment of the measure. Those burdens necessarily include the cost of defending against enforcement proceedings and paying whatever penalties might be incurred for violating the statute. In my judgment, the question whether those enforcement proceedings should be conducted exclusively by federal agencies, or may be brought by private parties as well, is a matter of policy for Congress to decide. In either event, once Congress has made its policy choice, the sovereignty concerns of the several States are satisfied, and the federal interest in evenhanded enforcement of federal law, explicitly endorsed in Article VI of the Constitution, does not countenance further limitations. There is not a word in the text of the Constitution supporting the Court's conclusion that the judge-made doctrine of sovereign immunity limits Congress' power to authorize private parties, as well as federal agencies, to enforce federal law against the States. The importance of respecting the Framers' decision to assign the business of lawmaking to the Congress dictates firm resistance to the present majority's repeated substitution of its own views of federalism for those expressed in statutes enacted by the Congress and signed by the President.

---

stitutional command. See *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 166–167 (1996) (SOUTER, J., dissenting). But in those instances, courts are not crafting wholly judge-made doctrines unrelated to any constitutional text, nor are they doing so solely under the guise of the necessity of safeguarding state interests.

[5] Because Congress has clearly expressed its intention to subject States to suits by private parties under the ADEA, I join Part III of the opinion of the Court.

The Eleventh Amendment simply does not support the Court's view. As has been stated before, the Amendment only places a textual limitation on the diversity jurisdiction of the federal courts. See *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 286–289 (1985) (Brennan, J., dissenting). Because the Amendment is a part of the Constitution, I have never understood how its limitation on the diversity jurisdiction of federal courts defined in Article III could be "abrogated" by an Act of Congress. *Seminole Tribe*, 517 U. S., at 93 (STEVENS, J., dissenting). Here, however, private petitioners did not invoke the federal courts' diversity jurisdiction; they are citizens of the same State as the defendants and they are asserting claims that arise under federal law. Thus, today's decision (relying as it does on *Seminole Tribe*) rests entirely on a novel judicial interpretation of the doctrine of sovereign immunity,[6] which the Court treats as though it were a constitutional precept. It is nevertheless clear to me that if Congress has the power to create the federal rights that these petitioners are asserting, it must also have the power to give the federal courts jurisdiction to remedy violations of those rights, even if it is necessary to "abrogate" the Court's "Eleventh Amendment" version of the common-law defense of sovereign immunity to do so. That is the essence of the Court's holding in *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 13–23 (1989).

I remain convinced that *Union Gas* was correctly decided and that the decision of five Justices in *Seminole Tribe* to overrule that case was profoundly misguided. Despite my respect for *stare decisis*, I am unwilling to accept *Seminole Tribe* as controlling precedent. First and foremost, the reasoning of that opinion is so profoundly mistaken and so

---

[6] Under the traditional view, the sovereign immunity defense was recognized only as a matter of comity when asserted in the courts of another sovereign, rather than as a limitation on the jurisdiction of that forum. See *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 136 (1812) (Marshall, C. J.); *Nevada* v. *Hall*, 440 U. S. 410, 414–418 (1979).

fundamentally inconsistent with the Framers' conception of the constitutional order that it has forsaken any claim to the usual deference or respect owed to decisions of this Court. *Stare decisis*, furthermore, has less force in the area of constitutional law. See, *e. g., Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406–410 (1932) (Brandeis, J., dissenting). And in this instance, it is but a hollow pretense for any State to seek refuge in *stare decisis'* protection of reliance interests. It cannot be credibly maintained that a State's ordering of its affairs with respect to potential liability under federal law requires adherence to *Seminole Tribe*, as that decision leaves open a State's liability upon enforcement of federal law by federal agencies. Nor can a State find solace in the *stare decisis* interest of promoting "the evenhanded . . . and consistent development of legal principles." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). That principle is perverted when invoked to rely on sovereign immunity as a defense to deliberate violations of settled federal law. Further, *Seminole Tribe* is a case that will unquestionably have serious ramifications in future cases; indeed, it has already had such an effect, as in the Court's decision today and in the equally misguided opinion of *Alden* v. *Maine*, 527 U. S. 706 (1999). Further still, the *Seminole Tribe* decision unnecessarily forces the Court to resolve vexing questions of constitutional law respecting Congress' § 5 authority. Finally, by its own repeated overruling of earlier precedent, the majority has itself discounted the importance of *stare decisis* in this area of the law.[7] The kind of judicial activism manifested in cases like *Seminole Tribe*,

---

[7] See, *e. g., College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S., at 675–683 (overruling *Parden* v. *Terminal R. Co. of Ala. Docks Dept.*, 377 U. S. 184 (1964)); *Seminole Tribe*, 517 U. S., at 63–73 (overruling *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1 (1989)); *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 127, 132–137 (1984) (STEVENS, J., dissenting) ("[T]he Court repudiates at least 28 cases, spanning well over a century of this Court's jurisprudence").

*Alden* v. *Maine, Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627 (1999), and *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U. S. 666 (1999), represents such a radical departure from the proper role of this Court that it should be opposed whenever the opportunity arises.

Accordingly, I respectfully dissent.

JUSTICE THOMAS, with whom JUSTICE KENNEDY joins, concurring in part and dissenting in part.

In *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234 (1985), this Court, cognizant of the impact of an abrogation of the States' Eleventh Amendment immunity from suit in federal court on "the usual constitutional balance between the States and the Federal Government," reaffirmed that "Congress may abrogate . . . only by making its intention unmistakably clear in the language of the statute." *Id.,* at 242. This rule "'assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.'" *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 65 (1989) (quoting *United States* v. *Bass,* 404 U. S. 336, 349 (1971)). And it is especially applicable when this Court deals with a statute like the Age Discrimination in Employment Act of 1967 (ADEA), whose substantive mandates extend to "elevator operators, janitors, charwomen, security guards, secretaries, and the like in every office building in a State's governmental hierarchy." *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.,* 411 U. S. 279, 285 (1973). Because I think that Congress has not made its intention to abrogate "unmistakably clear" in the text of the ADEA, I respectfully dissent from Part III of the Court's opinion.[1]

---

[1] I concur in Parts I, II, and IV of the Court's opinion because I agree that the purported abrogation of the States' Eleventh Amendment immunity in the ADEA falls outside Congress' § 5 enforcement power.

I

It is natural to begin the clear statement inquiry by examining those provisions that reside within the four corners of the Act in question. Private petitioners and the government correctly observe that the ADEA's substantive provisions extend to the States as employers, see 29 U. S. C. § 623(a) (providing that "[i]t shall be unlawful for an employer" to engage in certain age discriminatory practices); § 630(b) (defining "employer" to include "a State or a political subdivision of a State"); § 630(f) (defining "employee" as "an individual employed by any employer"), and that the ADEA establishes an individual right-of-action provision for "aggrieved" persons, see § 626(c)(1) ("Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter"). Since, in the case of a state employee, the only possible defendant is the State, it is submitted that Congress clearly expressed its intent that a state employee may qualify as a "person aggrieved" under § 626(c)(1) and bring suit against his state employer in federal court.

While the argument may have some logical appeal, it is squarely foreclosed by precedent—which explains the Court's decision to employ different reasoning in finding a clear statement, see *ante,* at 73. In *Employees,* we confronted the pre-1974 version of the Fair Labor Standards Act of 1938 (FLSA), which clearly extended as a substantive matter to state employers, and included the following private right-of-action provision: "'Action to recover such liability may be maintained in any court of competent jurisdiction.'" *Employees, supra,* at 283 (quoting 29 U. S. C. § 216(b) (1970 ed.)). We held that this language fell short of a clear statement of Congress' intent to abrogate. The FLSA's substantive coverage of state employers could be given meaning through enforcement by the Secretary of Labor, which would raise no Eleventh Amendment issue, 411 U. S., at 285–286, and we were "reluctant to believe that Congress in pursuit

of a harmonious federalism desired to treat the States so harshly" by abrogating their Eleventh Amendment immunity, *id.*, at 286. See also, *e. g., Dellmuth* v. *Muth,* 491 U. S. 223, 228 (1989) (holding that Congress had not clearly stated its intent to abrogate in a statute that authorized "parties aggrieved . . . to 'bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy' ") (quoting 20 U. S. C. § 1415(e)(2) (1982 ed.)).

The ADEA is no different from the version of the FLSA we examined in *Employees.* It unquestionably extends as a substantive matter to state employers, but does not mention States in its right-of-action provision: "Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter." 29 U. S. C. § 626(c)(1). This provision simply does not reveal Congress' attention to the augmented liability and diminished sovereignty concomitant to an abrogation of Eleventh Amendment immunity. "Congress, acting responsibly, would not be presumed to take such action silently." *Employees, supra,* at 284–285.

## II

Perhaps recognizing the obstacle posed by *Employees,* private petitioners and the Government contend that the ADEA incorporates a clear statement from the FLSA. The ADEA's incorporating reference, which has remained constant since the enactment of the ADEA in 1967, provides: "The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section." 29 U. S. C. § 626(b). It is argued that § 216(b)—one of the incorporated provisions from the FLSA—unequivocally abrogates the States' immunity from suit in federal court. That section states in relevant part that "[a]n action

to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction." 29 U. S. C. § 216(b).

But, as noted in the above discussion of *Employees,* § 216(b) was not always so worded. At the time the ADEA was enacted in 1967, a relatively sparse version of § 216(b)— which *Employees* held insufficient to abrogate the States' immunity—provided that an "[a]ction to recover such liability may be maintained in any court of competent jurisdiction." 29 U. S. C. § 216(b) (1964 ed.). It was not until 1974 that Congress modified § 216(b) to its current formulation. Fair Labor Standards Amendments of 1974 (1974 Amendments), § 6(d)(1), 88 Stat. 61.

This sequence of events suggests, in my view, that we should approach with circumspection any theory of "clear statement by incorporation." Where Congress amends an Act whose provisions are incorporated by other Acts, the bill under consideration does not necessarily mention the incorporating references in those other Acts, and so fails to inspire confidence that Congress has deliberated on the consequences of the amendment for the other Acts. That is the case here. The legislation that amended § 216(b), § 6(d)(1) of the 1974 Amendments, did not even acknowledge § 626(b). And, given the purpose of the clear statement rule to "'assur[e] that the legislature has in fact faced'" the issue of abrogation, *Will,* 491 U. S., at 65 (quoting *Bass,* 404 U. S., at 349), I am unwilling to indulge the fiction that Congress, when it amended § 216(b), recognized the consequences for a separate Act (the ADEA) that incorporates the amended provision.

To be sure, § 28 of the 1974 Amendments, 88 Stat. 74, did modify certain provisions of the ADEA, which might suggest that Congress understood the impact of § 6(d)(1) on the ADEA. See *ante,* at 76. But § 6(d)(2)(A), another of the 1974 Amendments, suggests just the opposite. Section

6(d)(2)(A) added to the statute of limitations provision of the FLSA, 29 U. S. C. § 255, a new subsection (d), which suspended the running of the statutory periods of limitation on "any cause of action brought under section 16(b) of the [FLSA, 29 U. S. C. § 216(b)] . . . on or before April 18, 1973," the date *Employees* was decided, until "one hundred and eighty days after the effective date of [the 1974 Amendments]." The purpose of this new subsection—revealed not only by its reference to the date *Employees* was decided, but also by its exception for actions in which "judgment has been entered for the defendant on the grounds other than State immunity from Federal jurisdiction"—was to allow FLSA plaintiffs who had been frustrated by state defendants' invocation of Eleventh Amendment immunity under *Employees* to avail themselves of the newly amended § 216(b).[2] It appears, however, that Congress was oblivious to the impact of § 6(d)(2)(A) on the ADEA. The new § 255(d), by operation of § 7(e) of the ADEA, 29 U. S. C. § 626(e) (1988 ed.) ("Sectio[n] 255 . . . of this title shall apply to actions under this chapter"),[3] automatically became part of the ADEA in 1974. And yet the new § 255(d) could have no possible application to the ADEA because, as the Court observes, *ante*, at 76 (citing § 28(a) of the 1974 Amendments), the ADEA's substantive mandates did not even apply to the States until the 1974 Amendments. Thus, before 1974,

---

[2] That Congress had this purpose in mind as to the FLSA does not mean that the product of Congress' efforts—the amended § 216(b)—qualifies as a clear statement. The amended § 216(b)'s description of the forum as "any Federal . . . court of *competent* jurisdiction," 29 U. S. C. § 216(b) (emphasis added), is ambiguous insofar as a federal court might not be "competent" unless the state defendant consents to suit. See *infra*, at 108–109. My present point is simply that, even assuming the amended § 216(b) qualifies as a clear statement, the 1974 Congress likely did not contemplate the impact of the new § 216(b) on the ADEA.

[3] The ADEA was amended in 1991 to remove the incorporating reference. See Civil Rights Act of 1991, § 115, 105 Stat. 1079, 29 U. S. C. § 626(e).

there were no ADEA suits against States that could be affected by §255(d)'s tolling provision. If Congress had recognized this "overinclusiveness" problem, it likely would have amended §626(e) to incorporate only §§255(a)–(c). Cf. §626(b) (incorporating "the powers, remedies, and procedures provided in sectio[n] . . . 216 *(except for subsection (a) thereof")* (emphasis added)). But since Congress did not do so, we are left to conclude that Congress did not clearly focus on the impact of §6(d)(2)(A) on the ADEA. And Congress' insouciance with respect to the impact of §6(d)(2)(A) suggests that Congress was similarly inattentive to the impact of §6(d)(1).

Insofar as §6(d)(2)(A) is closer to §6(d)(1) in terms of space and purpose than is §28, the implication I would draw from §6(d)(2)(A) almost certainly outweighs the inference the Court would draw from §28. In any event, the notion that §28 of the 1974 Amendments evidences Congress' awareness of every last ripple those amendments might cause in the ADEA is at best a permissible inference, not "the unequivocal declaration which . . . is necessary before we will determine that Congress intended to exercise its powers of abrogation." *Dellmuth,* 491 U. S., at 232.

The Court advances a more general critique of my approach, explaining that "we have never held that Congress must speak with different gradations of clarity depending on the specific circumstances of the relevant legislation . . . ." *Ante,* at 76. But that descriptive observation, with which I agree, is hardly probative in light of the fact that a "clear statement by incorporation" argument has not to date been presented to this Court. I acknowledge that our previous cases have not required a clear statement to appear within a single section or subsection of an Act. *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1, 7–10 (1989), overruled on other grounds, *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44 (1996); see also *id.,* at 56–57 (confirming clear statement in one statutory subsection by looking to provisions in other

subsection).  Nor have our cases required that such separate sections or subsections of an Act be passed at the same time. *Union Gas, supra,* at 7–13, and n. 2 (consulting original provisions of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 and 1986 amendments to that Act).  But, even accepting *Union Gas* to be correctly decided, I do not think the situation where Congress amends an incorporated provision is analogous to *Union Gas.*  In the *Union Gas* setting, where the later Congress actually amends the earlier enacted Act, it is reasonable to assume that the later Congress focused on each of the various provisions, whether new or old, that combine to express an intent to abrogate.

## III

Even if a clarifying amendment to an incorporated provision might sometimes provide a clear statement to abrogate for purposes of the Act into which the provision is incorporated, this is not such a case for two reasons.  First, § 626(b) does not clearly incorporate the part of § 216(b) that establishes a private right of action against employers.  Second, even assuming § 626(b) incorporates § 216(b) in its entirety, § 216(b) itself falls short of an "unmistakably clear" expression of Congress' intent to abrogate the States' Eleventh Amendment immunity from suit in federal court.

## A

I do not dispute that § 626(b) incorporates into the ADEA some provisions of § 216(b).  But it seems to me at least open to debate whether § 626(b) incorporates the portion of § 216(b) that creates an individual private right of action, for the ADEA already contains its own private right-of-action provision—§ 626(c)(1).  See *McKennon* v. *Nashville Banner Publishing Co.,* 513 U. S. 352, 358 (1995) ("The ADEA . . . contains a vital element found in both Title VII and the Fair Labor Standards Act: It grants an injured employee a

right of action to obtain the authorized relief. 29 U. S. C. § 626(c)"); 1 B. Lindemann & P. Grossman, Employment Discrimination Law 573–574 (3d ed. 1996) ("The ADEA grants any aggrieved person the right to sue for legal or equitable relief that will effectuate the purposes of the Act" (citing § 626(c)(1)) (footnote omitted)). While the right-of-action provisions in §§ 626(c) and 216(b) are not identically phrased, compare § 626(c)(1) ("Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter"), with § 216(b) ("An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction . . ."), they are certainly similar in function.

Indeed, if § 216(b)'s private right-of-action provision were incorporated by § 626(b) and hence available to ADEA plaintiffs, the analogous right of action established by § 626(c)(1) would be wholly superfluous—an interpretive problem the Court does not even pause to acknowledge. To avoid the overlap, one might read the ADEA to create an *exclusive* private right of action in § 626(c)(1), and then to add various embellishments, whether from elsewhere in the ADEA, see § 626(c)(2) (trial by jury), or from the incorporated parts of the FLSA, see, *e. g.*, § 216(b) (collective actions); *ibid.* (attorney's fees); *ibid.* (liquidated damages).[4]

Of course the Court's interpretation—that an ADEA plaintiff may choose § 626(c)(1) or § 216(b) as the basis for his private right of action—is also plausible. "But such a permissible inference, whatever its logical force, would remain just that: a permissible inference. It would not be the unequivocal declaration which . . . is necessary before we will determine that Congress intended to exercise its powers

---

[4] The ADEA expressly limits this last remedy to "cases of willful violations." 29 U. S. C. § 626(b); see *Lorillard* v. *Pons*, 434 U. S. 575, 581 (1978).

of abrogation." *Dellmuth,* 491 U. S., at 232. Apparently cognizant of this rule, the Court resorts to extrinsic evidence: our prior decisions. See, *e. g., ante,* at 74 (" '[T]he ADEA incorporates enforcement provisions of the Fair Labor Standards Act of 1938, and provides that the ADEA shall be enforced using certain of the powers, remedies, and procedures of the FLSA' " (alteration in original)) (quoting *Hoffmann-La Roche Inc.* v. *Sperling,* 493 U. S. 165, 167 (1989) (citations omitted)). But judicial opinions, especially those issued subsequent to the enactments in question, have no bearing on whether *Congress* has clearly stated its intent to abrogate in the text of the statute. How could they, given that legislative history—which at least antedates the enactments under review—is "irrelevant to a judicial inquiry into whether Congress intended to abrogate the Eleventh Amendment"? *Dellmuth, supra,* at 230. In any event, *Hoffmann-La Roche,* which did not present the question of a State's Eleventh Amendment immunity,[5] is perfectly consistent with the view that the ADEA incorporates only "extras" from the FLSA, not overlapping provisions. *Hoffmann-La Roche* involved the ADEA's incorporation of the FLSA's authorization of collective actions, which *follows* § 216(b)'s individual private right-of-action provision, see § 216(b) ("An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one

---

[5] That the *Hoffmann-La Roche* Court did not consider § 216(b)'s implications for the Eleventh Amendment clear statement rule is apparent from its selective quotation of § 216(b)—omitting the words "(including a public agency)." See 493 U. S., at 167–168 ("This controversy centers around one of the provisions the ADEA incorporates, which states, in pertinent part, that an action 'may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated'" (alteration in original)) (quoting 29 U. S. C. § 216(b) (1982 ed.)).

or more employees for and in behalf of himself or themselves *and other employees similarly situated*" (emphasis added)), and so may be viewed as falling outside the overlap described above.[6]

## B

Even if § 626(b) incorporates § 216(b)'s individual right-of-action provision, that provision itself falls short of "unmistakable" clarity insofar as it describes the forum for suit as "any Federal or State court of *competent* jurisdiction." § 216(b) (emphasis added). For it may be that a federal court is not "competent" under the Eleventh Amendment to adjudicate a suit by a private citizen against a State unless the State consents to the suit. As we explained in *Employees*, "[t]he history and tradition of the Eleventh Amendment indicate that by reason of that barrier a federal court is not *competent* to render judgment against a *nonconsenting* State." 411 U. S., at 284 (emphasis added). The Court suggests, *ante*, at 76–77, that its ability to distinguish a single precedent, *ante*, at 75–76 (discussing *Kennecott Copper Corp.* v. *State Tax Comm'n*, 327 U. S. 573 (1946)), illuminates this aspect of § 216(b). But the Court neither acknowledges what *Employees* had to say on this point nor explains why it follows from the modern § 216(b)'s clarity *relative* to the old § 216(b) that the modern § 216(b) is clear enough as an *absolute* matter to satisfy the *Atascadero* rule, which requires "unmistakable" clarity.

That is not to say that *the FLSA as a whole* lacks a clear statement of Congress' intent to abrogate. Section 255(d)

---

[6] The other two cases upon which the Court relies, see *ante*, at 74–75 (citing *McKennon* v. *Nashville Banner Publishing Co.*, 513 U. S. 352, 357 (1995), and *Lorillard* v. *Pons*, *supra*, at 582), are also consistent with the view that the ADEA incorporates only "extras" from the FLSA, not overlapping provisions. In neither case did we consider whether the ADEA incorporates the part of § 216(b) that creates a private action "against any employer (including a public agency) in any Federal or State court of competent jurisdiction."

elucidates the ambiguity within § 216(b). Section 255(d), it will be recalled, suspended the running of the statute of limitations on actions under § 216(b) brought against a State or political subdivision on or before April 18, 1973 (the date *Employees* was decided) until "one hundred and eighty days after the effective date of the [1974 Amendments], except that such suspension shall not be applicable if in such action judgment has been entered for the defendant on the grounds other than *State immunity from Federal jurisdiction*." § 255(d) (emphasis added). As I explained in Part II,[7] however, not only does § 255(d) on its face apply only to the FLSA, but Congress' failure to amend the ADEA's general incorporation of § 255, 29 U. S. C. § 626(e) (1988 ed.), strongly suggests that Congress paid scant attention to the impact of § 255(d) upon the ADEA. Accordingly, I cannot accept the notion that § 255(d) furnishes clarifying guidance in interpreting § 216(b) for ADEA purposes, whatever assistance it might provide to a construction of § 216(b) for FLSA purposes.[8]

\* \* \*

For these reasons, I respectfully dissent from Part III of the Court's opinion.

---

[7] *Supra*, at 101–105.

[8] While § 255 once was incorporated by the ADEA, see § 7(e), 81 Stat. 605, 29 U. S. C. § 626(e) (1988 ed.), the ADEA was amended in 1991 to remove the incorporating reference, see Civil Rights Act of 1991, § 115, 105 Stat. 1079, 29 U. S. C. § 626(e). The current "unavailability" of § 255(d) for ADEA purposes perhaps explains why the Court, which purports to examine only the statute in its current form, *ante*, at 76, does not rely on § 255(d). But, as I have explained, without the light § 255(d) sheds on § 216(b), § 216(b) falls short of a clear statement of Congress' intent to abrogate.