**Rebecca W. ROOT, Plaintiff,**

v.

**GEORGIA STATE BOARD OF VETERINARY MEDICINE, Defendant.**

No. Civ.A.1:99–CV–1222CC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 17, 2000.

Howell W. Ragsdale, Jr., Office of Howell W. Ragsadale, Jr., Atlanta, GA, Jo Anne Simon, pro hac vice, Brooklyn, NY, for plaintiff.

Bruce McCord Edenfield, Amber Bollinger Shushan, Gray Hedrick & Edenfield, Atlanta, GA, for Georgia State Bd. of Veterinary Medicine.

Robert J. Raubach, Georgia Advocacy Office, Tucker, GA, for Georgia Advocacy Office, amicus.

*ORDER*

COOPER, District Judge.

Pending before the Court in this disability discrimination action are: (1) Defendant Georgia State Board of Veterinary Medicine's ("Defendant") Suggestion of Lack of Subject Matter Jurisdiction and Motion to Dismiss [14–1]; (2) Defendant's Motion for Summary Judgment [22–1]; (3) Plaintiff Rebecca W. Root's ("Plaintiff") Motion for Leave to Amend Complaint to Add Necessary Parties [29–1]; and (4) Plaintiff's Motion for Leave to Amend Complaint to Include Denial of Accommodations in December 1997 [34–1]. Plaintiff brings this action pursuant to Titles II and III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701, *et seq.*

## *BACKGROUND*

Plaintiff is a 47–year–old woman who graduated from Jacksonville State University in Alabama in 1974 with a bachelor's degree in elementary education and a minor in art. After graduating from college, Plaintiff taught sixth and seventh grade. While teaching full-time, Plaintiff worked to obtain a master's degree in education from the University of Georgia, which she obtained in 1977. The following year, in 1978, Plaintiff began working towards obtaining a master's degree in community counseling, also from the University of Georgia. While working toward her second master's degree, Plaintiff worked full-time as a teacher and counselor for criminal offenders at Athens Regional Youth Development Center, where she taught English, basic math, and health. Plaintiff received her master's degree in community counseling in 1981.

In 1989, Plaintiff began saving money to attend veterinary school. While working full-time at the youth detention center, Plaintiff worked part-time as a veterinary technician at an animal clinic in Athens

during 1991 and 1992. Plaintiff also took additional college courses from 1991 to 1993 in order to obtain the prerequisite courses necessary to attend veterinary school.[1] Thereafter, in 1993, Plaintiff was admitted to the University of Georgia Veterinary School. While attending veterinary school, during 1994–95 Plaintiff worked part-time as a lab technician at the school through a work study program. Plaintiff graduated from veterinary school in 1996.

In order to become a licensed veterinarian, Plaintiff has to achieve a converted score of 75 or greater on three required exams: (1) the State Board Examination ("State Laws & Rules"); (2) the Clinical Competency Test ("CCT"); and (3) the National Board Examination ("NBE"). These exams are offered in April and December of each year, and are administered for Defendant by the office of Examination Development and Testing ("EDT") of the State Examining Boards. The Executive Director of EDT is Lila Quero–Munoz, Ph.D. Dr. Quero–Munoz' duties include reviewing requests for test accommodations.

Plaintiff has taken and passed the State Laws & Rules and the CCT exams.[2] Plaintiff has not, however, passed the NBE, a 400 multiple-choice exam designed to access the test taker's knowledge of veterinary medicine. From December 1995 to December 1999, Plaintiff has taken the NBE a total of eight times but has failed to achieve a passing score.[3]

In 1995, while she was in her third year of veterinary school, Plaintiff was evaluated by the University of Georgia's Regents' Center for Learning Disorders ("Regents' Center") to determine whether she had learning disabilities. According to Plaintiff, she has had difficulty with learning all of her life, and she states that as a child she had difficulties such as learning the alphabet, learning the sounds of letters, and comprehending what she read and retaining the information. Despite these difficulties, however, the Regents' Center determined that Plaintiff had no learning disability.

Plaintiff requested testing accommodations from the State Examining Boards for the first time prior to the December 1997 NBE. Several weeks before this exam, Plaintiff began seeing Dr. Earl Ginter, a licensed professional counselor at the University of Georgia, for test anxiety. Dr. Ginter wrote to the State Examining Boards requesting that certain accommodations be made to help decrease Plaintiff's performance anxiety during administration of the December 1997 exam. Dr. Ginter recommended, among other things, that Plaintiff be permitted to take the exam in isolation, that she be given additional time to take the exam, that a person read each question and the multiple choice answers to Plaintiff, that someone other than Plaintiff fill out her answer sheet, and that she be given a 10–minute break after every 50 questions. In response to this request, Susan All, an Exam Program Monitor for the office of EDT, wrote to Plaintiff to inform her of the accommodations that were approved for the exam: (1) time and one half the regular testing time, for a total testing time of 12 hours; (2) a separate testing room; and (3) an exam period of two test days. Plaintiff took the exam with these accommodations, but she did not receive a passing score.

After receiving her December 1997 NBE score, Plaintiff's sister asked the Director of the Regents' Center, Noel Gregg,

1. Plaintiff also taught a freshman biology course at a local college during the summer of 1993.

2. Plaintiff passed the State Laws & Rules exam on her first attempt in December 1995. She passed the CCT exam on her second attempt in April 1996.

3. Plaintiff received a converted score of 61 in December 1995, a converted score of 72 in April 1996, a converted score of 65 in December 1996, a converted score of 71 in April 1997, a converted score of 68 in December 1997, a converted score of 70 in December 1998, a converted score of 71 in April 1999, and a converted score of 68 on the December 1999 exam.

Ph.D, to re-evaluate Plaintiff. Dr. Gregg agreed, and Plaintiff was re-tested by the Regents' Center in late July and early August of 1998.[4] Plaintiff was diagnosed with "Learning Disabilities, Attention Deficit Hyperactivity Disorder, Combined Type."

On September 11, 1998, J. Mark Davis, Ph.D., a licensed psychologist and one of the doctors who evaluated Plaintiff at the Regents' Center, wrote the Examining Boards requesting accommodations for Plaintiff during the December 1998 NBE based upon Plaintiff's diagnosis of learning disabilities and Attention Deficit Hyperactivity Disorder ("ADHD"). Dr. Davis recommended a private testing room, double test taking time and scheduled breaks during the exam, and a reader to read the questions and multiple choice answers to Plaintiff. On November 3, 1998, Ms. All wrote to Plaintiff informing her that she had been approved for the following accommodations for the December 1998 exam: (1) double the standard testing time for a total testing time of 16 hours; (2) a separate testing room; (3) a two day exam period with 8 hours of testing per day and breaks after each 2 hours of testing; and (4) a reader who would read the questions and answer choices and also mark Plaintiff's answers on the answer sheet.

In her capacity as Executive Director of the EDT, Dr. Quero–Munoz selected Jeanne Blackmon as Plaintiff's reader for the December 1998 NBE. Ms. Blackmon is a retired teacher and librarian with a bachelor's degree in English history and a minor in elementary education, as well as a master's degree in library science. Ms. Blackmon had previous experience proctoring and reading exams for the Examining Boards, including reading several items on the NBE to a licensing candidate several years earlier. The day before the exam, Ms. Blackmon went to the office of EDT to review the NBE and to read several exam items aloud for Dr. Quero–Munoz. Dr. Quero–Munoz felt that Ms. Blackmon read appropriately.

Ms. Blackmon began reading the exam to Plaintiff on the morning of the first day of testing, December 8, 1998. According to Plaintiff, Ms. Blackmon could not pronounce the scientific/medical terms on the exam, as well as many of the common words. Ms. Blackmon was also distracting to Plaintiff and increased her test anxiety by making comments about the difficulty of certain words.[5] Although Plaintiff did not complain directly to Ms. Blackmon, during the lunch break of her first day of testing, Plaintiff called her sister to complain about Ms. Blackmon's reading. Plaintiff's sister contacted a friend who in turn contacted Dr. Davis. Dr. Davis contacted the Examining Boards and requested a replacement reader based upon the reader's inability to read words accurately. Dr. Quero–Munoz decided to replace Ms. Blackmon with Barbara Dick, who was proctoring another exam in the same building that day. Ms. Dick has master's degrees in English literature and psychology, had proctored exams for the Examining Boards for approximately five years, and had previously read other state board exams for candidates without complaint.

Ms. Dick reviewed the NBE during her lunch break and began reading for Plaintiff after lunch on the first day of testing.[6] Ms. Dick told Plaintiff to notify her if she was doing anything that was not helpful, and to alert her if she was going too fast or too slow. Ms. Dick read to Plaintiff for

---

4. Plaintiff was re-evaluated because "the [1995] evaluation did not involve comprehensive assessment of basis language abilities and learning/memory across modes of input (i.e., auditory versus visual), as instruments to measure these areas were not available." Defendants Ex. 25, p. 2.

5. Plaintiff avers that on the way to the testing room, Ms. Blackmon asked her how much of the test and how many of the words she would need to read for Plaintiff, and that when she told Ms. Blackmon that she needed to read the entire test, Ms. Blackmon said "I don't know all these big words on this test." Plaintiff's Aff., ¶ 35. Plaintiff states that this exchange overwhelmed her with anxiety.

6. Ms. Dick offered to re-read the entire exam to Plaintiff, but Plaintiff declined.

the rest of the first day of testing and the entire second day of testing. While Plaintiff avers that Ms. Dick also did not pronounce many of the medical terms correctly and that she rushed Plaintiff through questions, Plaintiff did not request a new reader because she states that she felt that she had no choice but to complete the exam with Ms. Dick. Once again, Plaintiff failed to pass the NBE.

In March of 1999, Dr. Davis again wrote to the Examining Boards requesting accommodations for Plaintiff with respect to the April 1999 NBE. After obtaining feedback from Plaintiff regarding her experience during the December 1998 exam, in his request, Dr. Davis stated that Plaintiff needed a "qualified reader able to read and pronounce the relevant terminology for all written exams and ability to maintain silence between the questions read so that [Plaintiff] can concentrate on the substance of the test items and derive the answers...." Def.'s Ex. 16. Dr. Davis also approved the use of a tape-recorded exam taped by a qualified reader. On March 16, 1999, Ms. All wrote to Plaintiff informing her that the same accommodations that were provided to her for the December 1998 exam would be given to her for the April 1999 exam.

Dr. Quero–Munoz selected George Morrison to read for Plaintiff during the April exam. Mr. Morrison has a bachelor's degree in psychology, and master's degrees in vocational rehabilitation counseling and industrial and organizational psychology. He had previously worked for the Examining Boards as a test development consultant and had worked with NBE candidates. Mr. Morrison reviewed the NBE prior to the exam and obtained both a medical and a regular dictionary to ensure that he could pronounce all words and

terms on the exam.[7] According to Plaintiff, however, her anxiety increased when Mr. Morrison informed her that he had brought dictionaries to check a word pronunciation if needed. Once again, Plaintiff failed to pass the April exam, receiving a converted score of 71.

After sitting for the April 1999 NBE, Plaintiff filed the instant lawsuit against Defendant in May of 1999, contending that Defendant discriminated against her with respect to the December 1998 and April 1999 exams because it failed to provide her with adequate accommodations when she took these exams. More specifically, Plaintiff alleges that Defendant has violated Titles II and III of the ADA, which prohibit discrimination by public and private entities against persons with disabilities, and the Rehabilitation Act, which prohibits discrimination against persons with disabilities under any program and/or activity receiving federal financial assistance. Plaintiff also contends that Defendant's provision of preference points to military veterans pursuant to O.C.G.A. § 43–1–9 is discriminatory. Plaintiff seeks permanent injunctive relief in the form of a license to practice veterinary medicine, monetary damages for lost past, present, and future wages, and attorney's fees.

Subsequent to filing this litigation, Plaintiff applied to sit for the December 1999 NBE and once again requested accommodations.[8] Dr. Davis again wrote to the Examining Boards and requested the same accommodations he had proposed for the April 1999 exam. Additionally, during the course of this litigation, Dr. Gregg and Dr. Davis recommended the following accommodations for Plaintiff during the December 1999 exam: (1) that Plaintiff be provided an audiotape that was compatible with the special tape recorder used by

---

7. Mr. Morrison was informed that Plaintiff had not been pleased with her previous readers.

8. During her deposition, Plaintiff testified regarding her ideal testing situation. She explained that she desired a reader who was able to confidently read medical terminology and who did not communicate with her unnecessarily. She stated that she preferred the April 1999 testing room due to its quiet location and that she did not like having individuals in the testing room with her because they distracted her. Plaintiff also expressed an interest in taking a tape-recorded exam.

Plaintiff; (2) that Plaintiff be provided with an audiotape of sample questions so that she could practice with her tape player prior to the exam; and (3) that the exam be divided over four testing days with a total of only 100 questions per day. On November 23, 1999, Ms. All wrote to Plaintiff informing her that the following accommodations would be provided to her for the December 1999 exam: (1) double the regular testing time for a total of 16 hours; (2) a private testing room; (3) an exam period of four days, with four hours of testing per day; (4) scheduled breaks during each day of testing; (5) an audiotaped exam to be played on Plaintiff's tape recorder; and (6) a qualified reader on the tape who could read and pronounce relevant terminology and who would maintain silence between questions. A sample question tape was also provided to Plaintiff,[9] and it was agreed that a veterinarian would be available throughout the entire exam to respond to any of Plaintiff's pronunciation questions in the event that the reader on the audiotape was inaudible or some other problem occurred.[10] Once again, however, Plaintiff failed to achieve a passing score on the December 1999 exam.

### DISCUSSION

#### I. DEFENDANT'S MOTION TO DISMISS

■ Defendant has filed a motion suggesting that this Court may not have subject matter jurisdiction over this action in light of the Supreme Court's decision in *Kimel v. State of Florida Board of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). In that case, the Supreme Court determined that Congress exceeded its authority under Section 5 of the Fourteenth Amendment when it abrogated the states' Eleventh Amendment immunity under the Age Discrimination in Employment Act ("ADEA"). Defendant contends that employing the analysis mandated by the Supreme Court in the *Kimel* decision demonstrates that Congress also exceeded its authority in abrogating the states' immunity under the ADA and the Rehabilitation Act, and that insofar as it is a state agency, it is immune from Plaintiff's claims under these statutes. The Supreme Court's decision in *Kimel* notwithstanding, in *Garrett v. Univ. of Alabama at Birmingham Bd. of Trustees*, 193 F.3d 1214, 1218 (11th Cir.1999), the Eleventh Circuit, stating that it was bound by that portion of its decision in *Kimel v. State Bd. of Regents*, 139 F.3d 1426, 1433 (11th Cir.1998), pertaining to the ADA (as opposed to the ADEA), again ruled that the ADA is a valid exercise of the Enforcement Clause of the Fourteenth Amendment and that the states do not have sovereign immunity from claims brought under either the ADA or the Rehabilitation Act. While certiorari has been granted in *Garrett* (*see* —— U.S. ——, 120 S.Ct. 1669, 146 L.Ed.2d 479 (2000)), the Supreme Court has not yet rendered a decision, and the *Garrett* decision still serves as binding precedent on this Court. Accordingly, Defendant's motion to dismiss based upon its assertion that this Court lacks subject matter jurisdiction because neither the ADA nor the Rehabilitation Act validly abrogate the state's immunity is DENIED at this time as premature.

#### II. PLAINTIFF'S MOTION TO AMEND TO ADD CAUSE OF ACTION

■ Plaintiff seeks leave to amend her complaint to add a cause of action for

9. The sample tape was provided by Professional Examination Service ("PES"), the testing agency of the American Veterinary Medical Association that develops and scores the NBE. PES provided the tape as well as four special testing booklets of 100 questions each (the test provided to other candidates is divided into two booklets of 200 questions each).

10. Each veterinarian was provided with sample questions and were given instructions based upon Dr. Davis' recommendations and Plaintiff's testimony regarding the behavior of previous readers and proctors. They were also instructed to come to the exam site to review the entire exam to ensure that they were knowledgeable of the terms on the exam.

discrimination with respect to Defendant's failure to provide a reader for Plaintiff for the December 1997 NBE.[11] Plaintiff, however, was fully aware of the facts giving rise to this claim when she filed her complaint in May of 1999. Further, the December 1997 exam was discussed during Plaintiff's deposition in October of 1999, but Plaintiff did not seek leave to amend her complaint to add this claim until after discovery had closed and dispositive motions had been filed by Defendant. The reason advanced by Plaintiff for failing to include this cause of action in her complaint is "law office oversight." Such reason is insufficient to justify Plaintiff's undue delay in seeking leave to amend her complaint. Accordingly, Plaintiff's motion to amend her complaint to add a claim with respect to the December 1997 NBE is DENIED.[12] *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (factors justifying denial of a motion to amend include "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment"); *see also, McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1309 (11th Cir.1999) (where plaintiff did not seek leave to amend until 2 months after deadline for amending pleadings had passed, the dispositive motion deadline was one month away, plaintiff and defendant's representatives had been deposed, and plaintiff had knowledge of the information contained in the proposed amendment when she filed the lawsuit, denial of motion to amend was proper).

## III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P 56(c). The movant carries the initial burden of showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The non-movant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

A court evaluating a summary judgment motion must view the evidence in the light most favorable to the non-movant. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986), *reh'g denied*, 815 F.2d 66 (11th Cir.1987). However, Rule 56 "[b]y its very terms, ... provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The requirement is that there be no *genuine* issue of *material* fact." *Anderson v.*

---

**11.** As set forth in the background section above, in his letter to the State Examining Boards, among other things, Dr. Ginter proposed that Plaintiff be provided a reader for the December 1997 exam.

**12.** Denial of Plaintiff's motion is also warranted because her claim with respect to the

December 1997 exam is barred by the statute of limitations. A two-year statute of limitations applies to claims brought under the ADA and Section 504. *Everett v. Cobb County School Dist.*, 138 F.3d 1407, 1409 (11th Cir. 1998). As such, the statute of limitations with respect to any claim regarding the December 1997 exam expired by December of 1999.

*Liberty Lobby, Inc.*, 477 U.S. 242, 247–8, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The materiality of facts is governed by the substantive law. *Id.* at 248, 106 S.Ct. at 2510. A dispute is genuine if the evidence is such that the factual issues may reasonably be resolved in favor of either party. *Id.* at 250, 106 S.Ct. 2505.

### B. *Plaintiff's ADA Claims*

The intent of Congress in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Under the ADA,

> [t]he term disability means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an ·impairment.

42 U.S.C. § 12102(2).

Plaintiff has brought this lawsuit under Titles II and III of the ADA. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title III of the ADA provides in pertinent part that: "[a]ny person that offers examinations ... related to applications, licensing, certifica-

tion, or credentialing for ... professional, or trade purposes shall offer such examinations ... in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189.[13]

■ The parties agree that in order to establish a prima facie case of discrimination under the ADA, Plaintiff must show that: (1) she has a disability; (2) she is qualified with or without reasonable accommodations; and (3) she was unlawfully discriminated against because of her disability. *See Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir.1999).

### 1. *Whether Plaintiff is disabled under the ADA*

Defendant first contends that Plaintiff cannot establish a prima facie case because she does not suffer from a mental impairment.

#### a. Whether Plaintiff has a mental impairment

Congress authorized the Attorney General (Department of Justice or "DOJ") to issue implementing regulations with respect to subtitle A of Title II regarding public services, and with respect to those provisions of Title III regarding services provided by private entities. 42 U.S.C. §§ 12134, 12186(b).[14]

Under the regulations issued by the DOJ with respect to Title II of the ADA, a "physical or mental impairment" includes "[a]ny mental or psychological disorder such as mental retardation, organic brain

---

**13.** The term "person" is defined as having the same meaning as the term is given in § 701 of the Civil Rights Act of 1964. 42 U.S.C. § 12111(7). In the Civil Rights Act, the definition of person includes governments and governmental agencies. 42 U.S.C. § 2000e(a). As such, government agencies have been found to be subject to suit under Title III. *See, e.g., Pazer v. New York State Bd. of Law Examiners*, 849 F.Supp. 284 (S.D.N.Y. 1994).

**14.** Congress authorized the Equal Employment Opportunity Commission to issue regulations regarding Title I, which addresses workplace discrimination. 42 U.S.C. § 12116. "No agency, however, has been given authority to issue regulations implementing the generally applicable provisions of the ADA, see §§ 12101–12102, which fall outside Titles I–V. Most notably, no agency has been delegated authority to interpret the term 'disability.'" *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2145, 144 L.Ed.2d 450 (1999).

syndrome, emotional or mental illness, and specific learning disabilities." 28 C.F.R. § 35.104.

■ Relying on the opinion of its experts, Drs. Michael Gordon and George Litchford, two psychologists who did not personally evaluate Plaintiff but who reviewed her records, Defendant asserts in a cursory fashion that Plaintiff does not have a learning disability as she alleges. Defendant's experts opine that the information and documentation they reviewed regarding Plaintiff is inconsistent with a diagnosis of a learning disorder under the *Diagnostic and Statistical Manual of Mental Disorders—Fourth Edition* ("DSM–IV") criteria,[15] and that the tests used by Plaintiff's experts were unstandardized and experimental. The Court finds, however, that a genuine issue of material fact exists as to whether Plaintiff has a learning disability. Both Dr. Davis and Dr. Gregg, who, with the help of a team of doctors at the Regents' Center for Learning Disorders, evaluated and tested Plaintiff over the course of several days, determined that Plaintiff does have learning disabilities, including difficulty with automaticity in processing words and with phonological processing (which involves knowledge of and ability to manipulate the sounds that comprise words), as well as problems associated with her distractibility and difficulty focusing.[16] Their diagnosis of Plaintiff as learning disabled is based upon the definition published by the Interagency Committee on Learning Disabilities that is followed by each of the three Regents' Centers, and was made after Plaintiff had been evaluated in accordance with the Regents' Center guidelines, which require the testing and assessment of various intelligence, cognitive, language, and emotional factors and skills.[17] Plaintiff's experts vigorously dispute Drs. Gordon's and Litchford's assessment of their diagnosis of Plaintiff, plainly demonstrating that material facts are in dispute.

b. Whether Plaintiff is substantially limited in a major life activity

Defendant next contends that even if Plaintiff suffers from a mental impairment, the impairment does not substantially limit her in her major life activities. The DOJ regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 35.104; 28 C.F.R. § 36.104. An individual is substantially limited in a major life activity "when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. Pt. 35, App. A; 28 C.F.R. Pt. 36, App. B; *see also, Price v. National Bd. of Medical Examiners,* 966 F.Supp. 419, 425–27 (S.D.W.Va.1997).

While Defendant concedes that learning is a major life activity,[18] Defendant argues that Plaintiff is not substantially limited in learning in light of her self-accommodations and her ability to learn in comparison to most people.

15. According to Dr. Gordon, "the DSM–IV diagnosis of a learning disorder requires that there be a significant discrepancy between one's measured cognitive ability and one's academic achievement in the domains of reading, writing, and/or mathematics, and that a significant discrepancy is defined by a 2 standard deviation difference, ... with achievement being lower than ability." *See* Defendant's Brief in Support of Motion for Summary Judgment, Plaintiff's Ex. 15, ¶ C(1).

16. The Georgia Advocacy Office has submitted a brief stating that a learning disability is a "true" disability that is covered by the ADA.

17. Plaintiff's experts also state that in addition to meeting the Regents' Center guidelines, the Centers' evaluations also typically meet the DSM–IV criteria for learning disorders. In addition, the Regents' Center has adopted the DSM–IV criteria for diagnosing ADHD.

18. Plaintiff contends that she is also substantially limited in working. Because of its finding below, the Court does not address at this stage whether Plaintiff is substantially limited in her ability to work.

In addition to considering whether a disabled person can perform a particular major life activity as compared to most people, the Supreme Court has recently determined that mitigating measures must also be considered in determining whether a person is disabled under the ADA. In *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2146, 144 L.Ed.2d 450 (1999), the Supreme Court held that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus 'disabled' under the [ADA]."[19] The Court further instructed, however, that "[t]he use of a corrective device does not, by itself, relieve one's disability. Rather, one has a disability under subsection A [of 42 U.S.C. § 12102(2) ] if, notwithstanding the use of a corrective device, that individual is substantially limited in a major life activity." *Id.* 119 S.Ct. at 2149.

The Court finds that a genuine issue of fact exists with respect to whether Plaintiff is substantially limited in a major life activity insofar as Plaintiff's experts have testified that Plaintiff is substantially limited in learning as compared to most people. While Defendant argues that Plaintiff's academic achievements belies her contention that she is substantially limited in her ability to learn, Plaintiff has testified that she has had a lifelong struggle with learning, and has tried to compensate for her difficulties by having others read to her, assist her with spelling and in writing papers, and by choosing courses and degree programs that did not require much reading and writing and in which she could take her exams orally. Plaintiff's testimony is corroborated by the testimony of several witnesses, including her mother, sister, classmates, and doctors.[20] Plaintiff's attempts to compensate for her learning difficulties do not correct her disability in the same way that glasses (*see Sutton, supra*) or the body's internal systems (*Albertson, supra*) can correct or compensate for impaired vision.[21] In this regard, Dr. Gregg has opined that while "[m]ost remedial efforts can produce some benefits, [ ] they do not eliminate a learning disability, nor can they 'correct it.' " Affidavit of Dr. Noel Gregg, ¶ 11. In light of the evidence before the Court, summary judgment is not appropriate based upon Defendant's contention that Plaintiff is not substantially limited in a major life activity.

### 2. *Whether Plaintiff is qualified*

Under Title II, a qualified individual is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, ... or the provision of auxiliary aids and services,

19. *See also, Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999) ("[w]e see no principled basis for distinguishing between measures undertaken with artificial aids, like medications and devices, and measures undertaken, whether consciously or not, with the body's own systems").

20. Dr. Davis avers that Plaintiff's "disabilities have made every success, no matter how small, a battle to break down barriers. to learning. In fact, the record and my Rule 26 statement reflect that Plaintiff has exerted extraordinary efforts to achieve the fairly lackluster grades she received in lecture and test based courses in veterinary school. The record also reflects that she received a great deal of assistance throughout her education, assistance doing things that come naturally to those with far less capabilities." Affidavit of Dr. John Mark Davis, ¶ 8. Dr. Davis and Plaintiff also aver that Plaintiff was not diagnosed with learning disabilities earlier in life because of the lack of services in schools in the 1950's and 1960's.

21. In *Sutton,* the Supreme Court noted that an individual may still be disabled notwithstanding the use of a corrective device. As an example, the Court stated that "individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run. The same may be true of individuals who take medicine to lessen the symptoms of an impairment so that they can function but nevertheless remain substantially limited." *Sutton,* 119 S.Ct. at 2149.

meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The undisputed evidence demonstrates that Plaintiff is qualified to take the NBE because, as a graduate of the University of Georgia's Veterinary School, she meets the eligibility requirements for taking the exam.

### 3. *Whether Defendant discriminated against Plaintiff*

The crux of Plaintiff's lawsuit is her contention that Defendant denied her adequate accommodations with respect to its administration of the December 1998 and April 1999 NBE exams, and thus it has discriminated against her under the ADA.

Under Title III, an examination must be offered in a manner that is accessible to persons with disabilities. In this regard, the DOJ regulations provide that

> [a] private entity offering an examination covered by this section shall provide appropriate auxiliary aids for person with impaired sensory, manual, or speaking skills, unless that private entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden. Auxiliary aids and services required by this section may include taped examinations, interpreters ... or qualified readers for individuals with visual impairments or learning disabilities, transcribers for individuals with manual impairments, and other similar services and actions.

28 C.F.R. § 36.309(b)(3).[22]

In the instant case, for both the December 1998 and April 1999 exams, in response to Plaintiff's requests for accommodation and Dr. Davis' recommendations, Plaintiff was provided with a reader, double the standard test-taking time over a period of two days, a separate testing room, and breaks after each two hours of testing. In addition, the reader was directed to mark Plaintiff's answers on her answer sheet. The first reader selected for Plaintiff was Ms. Blackmon. According to Plaintiff, Ms. Blackmon was unable to pronounce many of the medical terms as well as some of the non-scientific words on the exam. After Plaintiff expressed dissatisfaction with Ms. Blackmon, following the morning session of the first day of the December 1998 exam Ms. Blackmon was replaced with Ms. Dick, with whom Dr. Quero–Munoz believed Plaintiff would be more comfortable. Plaintiff states that Ms. Dick also had difficulty pronouncing many of the medical terms on the exam, made distracting comments, and tried to hurry her through the exam. Plaintiff failed the December 1998 NBE.

After Dr. Davis clarified his request for a reader prior to the April 1999 exam by stating that the reader should be able to read and pronounce the relevant terminology and have the ability to maintain silence between questions, Dr. Quero–Munoz selected Mr. Morrison to read for Plaintiff. Dr. Quero–Munoz states that he was selected based upon his experience with the NBE, his knowledge of scientific/medical terms, and his familiarity with Latin pronunciations. Plaintiff states that she became extremely anxious upon meeting Mr. Morrison because he told her that he had brought a medical dictionary with him so he could look up a word in the dictionary if he didn't pronounce it correctly. According to Plaintiff (and Dr. Davis), however, Plaintiff would not know if Mr. Morrison was pronouncing a word correctly or not, which is the reason why she needed a reader in the first place. Mr. Morrison also had difficulty pronouncing many medical terms and dozed off between questions on occasion.

---

**22.** In addition, the Title II regulations provide that, when determining what type of auxiliary aid is necessary, "a public entity shall give primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 35.160(b)(2).

■ Viewing the evidence in the light most favorable to Plaintiff as the Court must, the Court finds that genuine issues of material fact exist with respect to whether the readers selected for Plaintiff were qualified to read for the NBE. The audiotape of both Ms. Blackmon's and Ms. Dick's reading of exam questions, as well as the testimony of Dr. Friel, a licensed veterinarian, with respect to Mr. Morrison's reading of the exam questions, demonstrates that the readers had significant difficulty reading and pronouncing many of the medical terms on the exam.[23] While Dr. Quero–Munoz states that she believed that the readers selected were qualified to read for the NBE based upon their experience reading for other exams and/or working with NBE candidates, and also based upon their reading of exams questions aloud to her, Dr. Quero–Munoz is not a veterinarian and the evidence is insufficient to demonstrate that she has adequate knowledge to determine whether a person without a relevant medical background is qualified to read for a person with Plaintiff's type of learning disabilities. Further, although the readers were instructed not to distract Plaintiff or to make comments or editorialize during the exam, according to Plaintiff, at least two of the readers did just that. Although Defendant did permit Plaintiff to have double time to take the exam, a separate room, and additional breaks in accordance with Dr. Davis' recommendations, where the readers were unable to accurately perform the reading function, summary judgment is inappropriate with respect to the reasonableness of the accommodations provided to Plaintiff.[24]

For the above stated reasons, Defendant's motion for summary judgment with respect to Plaintiff's claims under the ADA is DENIED.

### C. Plaintiff's Claims Under the Rehabilitation Act and Plaintiff's Motion to Add Additional Parties

Section 504 provides in pertinent part that: "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assis-

**23.** In this regard, Dr. Davis avers as follows: Plaintiff is at an extraordinary disadvantage if required to listen to complex questions and answer them when the reader either cannot pronounce the words correctly, or reads hesitantly while trying to sound out unfamiliar terms, or reads word by word in an effort to ascertain the pronunciation. A veterinarian need not be the reader. Anyone with a medical professional background should be able to do this. This could be a medical transcriptionist, a nurse, a veterinary technician, a pathologist, etc. People with degrees in teaching English, unless they were also medical professionals, would not appear to have the necessary background. I cannot stress enough the need for a reader that can accurately and fluently read all the necessary terminology with appropriate phrasing and inflection. A poor reader destroys context, which is one reason Plaintiff needs the reader in the first place.
Davis Aff., ¶ 38.

**24.** The Court notes here that since filing her lawsuit, Plaintiff again requested accommodations for the December 1999 NBE. For this exam administration, and pursuant to both her and Dr. Davis' requests, Plaintiff was provided a taped version of the exam compatible with Plaintiff's tape recorder. Plaintiff was also given a sample tape prior to the exam, was permitted to take the exam over a period of four days, and a veterinarian reader was available to Plaintiff for each day of the exam. Plaintiff complains, however, that the tapes did not contain only 25 questions on each side as she requested, and thus she was forced to skip questions because she could not locate them on the tape. In addition, she states that she had difficulty hearing some of the questions on the tape due to background noise. Once again, Plaintiff failed to achieve a passing score on the exam. Because the December 1999 exam administration is not a subject of Plaintiff's complaint, the accommodations provided by Defendant for this exam does not change the Court's analysis above with respect to the December 1998 and April 1999 exam administrations from which Plaintiff's claims arise.

tance....." 29 U.S.C. § 794(a). The term "program or activity" under Section 504 includes all of the operations of "a department, agency, special purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance." 29 U.S.C. § 794(b)(1)(B). Regulations promulgated under the Rehabilitation Act define a recipient of federal financial assistance as including "any instrumentality of a state, any public or private agency, institution, organization, or other entity ... to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient...." 45 C.F.R. § 84.3(f).

Plaintiff contends that Defendant is a recipient of federal financial assistance insofar as it receives test application fees from state [25] and/or federal agencies. Plaintiff has submitted no evidence, however, to support this contention. The uncontroverted evidence submitted by Defendant demonstrates that it does not receive test application fees from state and/or federal agencies, nor does it receive any other form of federal financial assistance.

■ Plaintiff seeks to save her claim under the Rehabilitation Act by filing a motion for leave of court to amend her complaint to add the Georgia Examining Boards Division of the Office of the Secretary of State and the State of Georgia as defendants in this action. However, Plaintiff has failed to show good cause for her failure to add these parties earlier in this litigation.[26] Similar to her belated attempt to add a cause of action with respect to the December 1997 NBE, Plaintiff was aware of the identity of the State of Georgia and

the Georgia Examining Boards Division before the initiation of this lawsuit insofar as her counsel met with representatives of the Boards Division prior to filing her complaint. In addition, Defendant denied that it received federal funding in its answer filed on June 18, 1999, in its responses to mandatory disclosures filed on July 6, 1999, and in the joint preliminary planning report and scheduling order filed on August 5, 1999. In their joint report, the parties acknowledged that there were no other necessary parties to this action. Further, Plaintiff had ample time and opportunity to discover facts relating to Defendant's receipt (or non-receipt) of federal funds during the discovery period, which ended on December 17, 1999. Plaintiff waited, however, until almost three months after the close of discovery, and after Defendant had filed its motion for summary judgment, to file her motion for leave to amend to add parties. Because she has failed to show good cause for her delay, Plaintiff's motion for leave to amend her complaint is DENIED. *See, Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1419 (11th Cir.1998) (where the information supporting plaintiff's proposed amendment was available to plaintiff before she filed suit and was confirmed during the pendency of the action, and where plaintiff failed to diligently conduct discovery, court concluded that "[i]n light of [plaintiff's] lack of diligence in protecting her rights, [plaintiff's] attempt to add a defendant outside the time frame prescribed by the scheduling order was not supported by good cause").[27]

Accordingly, for the above-stated reasons, Defendant's motion for summary

---

**25.** Plaintiff appears to contend that Defendant receives application fees from state agencies that receive federal funds, and thus Defendant is indirectly receiving federal financial assistance.

**26.** The preliminary planning report and scheduling order filed by the parties and approved by the undersigned provides that amendments to the pleadings filed later than 30 days after the preliminary planning report

is filed will not be accepted for filing unless otherwise permitted by law. Rule 16 requires that scheduling orders may be modified only upon a showing of good cause. Fed.R.Civ.P. 16(e).

**27.** Denial of Plaintiff's motion is also warranted under Federal Rule 15 for Plaintiff's undue delay in bringing the motion. *Foman,* 371 U.S. at 182, 83 S.Ct. 227.

judgment with respect to Plaintiff's claim under the Rehabilitation Act is GRANTED.

D. *Plaintiff's Claim Pursuant to O.C.G.A. § 43–1–9*

■ Pursuant to O.C.G.A. § 43–1–9, State Examining Boards are required to give point credits to veterans taking examinations given by the Boards.[28] Plaintiff's claim that § 43–1–9 is unlawful under the ADA is without merit. Plaintiff's claim that the statute violates the ADA is not within the zone of interests that the ADA was designed to protect. Plaintiff cannot show how the allocation of preference points to veterans discriminates against persons with disabilities as compared to the non-disabled. Furthermore, the claim is not properly raised against Defendant. Defendant did not create the statute, and Defendant has no discretion whether to comply with it—its compliance is mandatory. Plaintiff's claim is more appropriately directed to the state legislature. Moreover, Plaintiff has not challenged the statute on equal protection grounds,[29] and she has failed to show that the statute is unconstitutional or otherwise unlawful. For these reasons, Defendant's motion for summary judgment with respect to this claim is GRANTED.

## CONCLUSION

Defendant's Motion to Dismiss [14–1] is DENIED as premature. Defendant's Motion for Summary Judgment [22–1] is GRANTED in part, DENIED in part. The motion is GRANTED with respect to Plaintiff's claims under the Rehabilitation Act and O.C.G.A. § 43–1–9. The motion is DENIED with respect to Plaintiff's claims under Title II and Title III of the ADA. Plaintiff's Motion for Leave to Amend Complaint to Add Necessary Parties [29–1] is DENIED. Plaintiff's Motion for Leave to Amend Complaint to Include Denial of Accommodations in December 1997 [34–1] is DENIED.

28. Section 43–1–9 provides: "Any applicant who served on active duty in the armed forces of the United States or on active duty in a reserve component of the armed forces of the United States, including the National Guard, for a period of one year or more, of which at least 90 days were served during wartime or during any conflict when military personnel were committed by the President of the United States, shall be entitled to a credit of five points." O.C.G.A. § 43–1–9(1). Defendant states that the five points awarded equate to 5% of the total grade questions, resulting in 18 points being added to the veteran's raw test score.
Under O.C.G.A. § 43–1–9(3), certain disabled veterans who were discharged for injury or illness incurred in the line of duty are entitled to a credit of ten points. Citing this section, Plaintiff argues that a total of 10 (rather than 5) credits are actually awarded to veterans, resulting in 36 points being added to the veterans' raw score.

29. The Court notes here that the Supreme Court of Georgia has deemed veteran's preference points with respect to employment layoffs to be constitutional under the Fourteenth Amendment Equal Protection Clause. *Boykin v. Strickland*, 245 Ga. 294, 264 S.E.2d 225 (1980) (citing *Personnel Adm'r. of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)).